R. FRAZIER PEMBERTON and MRS. MARGUERITE PEMBERTON HAR-
RELSON, Guardians of W. S. PEMBERTON, v. J. L. LEWIS, Trading
as LEWIS FUNERAL HOME, and RICHARD GORDON.

(Filed 5 March, 1952.)

**1. Carriers § 21a (3)—**

A person transporting passengers for hire in an ambulance is a contract
carrier and owes his passengers the duty (1) to exercise ordinary care to
provide a vehicle reasonably safe for the carriage of passengers, (2) to
subject his vehicle to reasonable inspection, (3) to warn his passengers of
nonapparent dangers involved in the use of his vehicle, including latent
defects of which he has constructive notice, and (4) to operate the vehicle
in a careful and prudent manner in compliance with statutory rules of
the road.

**2. Carriers § 21b: Negligence § 3½—**

*Res ipsa loquitur* does not apply to the injury of a passenger in an
ambulance resulting from the sudden opening of the door while the vehicle
is in motion when the passenger's evidence itself undertakes to point out
reasons why the door suddenly opened.

**3. Carriers § 21b—Evidence held insufficient to show that defect in or non-
use of additional automatic locking device was proximate cause of acci-
dent resulting from sudden opening of ambulance door.**

Plaintiff was accompanying a patient in an ambulance and was assigned
a seat in the rear compartment, facing backward, and adjacent to a rear
compartment door. The automatic safety locking device by which this
compartment door was locked so that it could not be opened either from
the inside or outside when the driver's door was closed, was defective and
not in use on the occasion in question, but the door had the regular conven-
tional door lock and latch mechanism of the kind ordinarily used on auto-
mobiles, and there was no evidence of any defect in this mechanism. When
plaintiff was seated, his right hip was against or near the door handle,
but the door handle was in a vertical position, and the door could be
opened only by turning the lower end of the handle forward and upward,
and there was no evidence that the door would open from jar or vibration
or from pressure against it. The evidence tended to show that while the
ambulance was being driven at a rapid rate of speed along the highway
the door suddenly came open, and plaintiff fell to his injury. *Held:*
Whether the door was intentionally opened by plaintiff or whether the
movement of the vehicle could have caused plaintiff's body to push the
bottom end of the door handle forward and upward, is left in speculation
and conjecture and, therefore, the evidence is insufficient to show that the
accident was the natural and probable consequence of the defective condi-
tion of the automatic door lock appliance, and nonsuit should have been
entered.

Ervin, J., dissenting.

Appeal by defendants from *Moore, J.,* June Term, 1951, Guilford.
Reversed.

Civil action *ex delicto* to recover damages for personal injuries.

Defendant Lewis operates a funeral home. In connection therewith he maintains a combination hearse and ambulance. On the occasion of plaintiff's injuries, defendant Gordon was the driver of the ambulance on which plaintiff was riding. For convenience of discussion hereafter Lewis will be referred to as the defendant and Gordon as the driver.

The ambulance was a 1947 Miller body Cadillac having two compartments—one at the front for the driver and his companion, if any, and one at the back for the patient or corpse, as the case might be. There are two doors on the right side—one to the driver's compartment and one to the patient compartment. Hereafter, in referring to the doors, reference is had to the right side door to the patient compartment as patient compartment door and the one to the front on the right-hand side as the driver's door. Inside the patient compartment was a cot for the patient and two small seats for his nurse or companion. These seats, when not in use, folded into and became a part of the floor. The forward seat—the one here involved—opened next to the patient compartment door, facing to the rear, so that anyone occupying it would have his body up against the door with his hip against the door handle and with his back toward the front of the ambulance. This is the seat assigned to plaintiff when the ambulance left Tabor City, and is hereafter referred to as the passenger seat.

There are two locks to the patient compartment door. One is the conventional door latch or lock found on all Cadillac passenger motor vehicles. This mechanism is provided, in part, to keep the door closed while the vehicle is in motion. The other lock is a special dowel pin safety lock wholly disconnected from the conventional lock. A dowel metal pin extends through the body frame from the rear framework of the driver's door to the front framework of the patient compartment door and is equipped with a spring so that when the driver's door is closed, the pin is pushed into a slot in the patient compartment door, locking it so that it may not be opened either from the outside or from the inside. When the driver's door is opened, the spring pushes the metal pin forward, thus releasing and unlocking the patient compartment door. Plaintiff alleges that this special dowel pin lock was defective and in a state of bad repair on the day in question, and defendant admits in his answer that it was not in use on that day.

On 27 October 1949 defendant contracted to transport plaintiff's son, an invalid, from Tabor City to the Veterans' Hospital at Roanoke, Va. Under the contract plaintiff was to, and did, accompany his son. He was assigned the front passenger seat in the patient compartment so that when he was seated his body was up against the door and his hip was against or near the door handle. This door handle is in a vertical position under the arm rest. Its arm or handle extends downward, and it is attached to

the door immediately under and in a gap in the arm rest. To open the door, this handle must be pulled forward toward the front of the vehicle and toward plaintiff as he was seated in the chair assigned to him. In order to open the door, the passenger would have to move his body, reach under the arm rest, and pull the latch toward the front of the ambulance. On the day in question, the driver closed the patient compartment door before putting the vehicle in motion.

Just when the dowel pin lock was installed is not clear. One witness, a mechanic, testified that it was "just the same as it was when I put it on there" except that a new part had been put on it. Another testified that either a hand-operated or automatic safety latch was in general use in 1947.

While the vehicle was proceeding at about 55 miles per hour on a highway in Guilford County, the door opened and plaintiff fell out. Plaintiff's only eyewitness testified: "I saw it for only a moment. It appeared to be running very fast." Plaintiff was dragged a distance of about 300 feet before losing contact with the ambulance. The ambulance continued on for another 300 feet. Just when the driver became aware plaintiff had fallen from the ambulance is not disclosed.

Shortly before the door opened, the ambulance passed over the crest of a hill. At the time of the trial, there was a patch or repaired place in the pavement about thirteen feet wide. This patched place is about 126 feet beyond and on the near side of the crest of the hill; that is, it is between the crest of the hill and the place where plaintiff fell from the ambulance. The witness testified that she did not know whether it was there on the day of the accident or not. There is no evidence that it was. When the ambulance passed over the crest of the hill, the door was closed. Shortly thereafter, a witness heard a rather loud noise, looked out, and saw plaintiff being dragged along the highway. Whether the noise was produced by the opening of the door or by some other cause is not made to appear.

There is no evidence as to the absence of any object inside the passenger compartment to which a passenger could hold to balance himself. Nor is there any evidence the door had ever opened while the ambulance was in motion.

Plaintiff suffered serious and permanent physical injuries.

The defendants' motion for judgment of nonsuit at the close of plaintiff's evidence was overruled and defendants excepted. Appropriate issues were submitted to the jury and were answered in favor of plaintiff. From judgment on the verdict defendants appealed.

*Walter D. Thompson and Frazier & Frazier for plaintiff appellees.*

*R. B. Mallard and Smith, Sapp, Moore & Smith for defendant appellants.*

BARNHILL, J.   On this record defendant was a private or contract carrier of passengers for hire.

As such he owed the plaintiff the duty to exercise ordinary care to transport his passengers safely.   This general duty required him to (1) exercise ordinary care to supply a motor vehicle reasonably safe for the carriage of passengers, (2) subject his vehicle to reasonable inspection, (3) warn his passengers of nonapparent dangers involved in the use of his vehicle, including latent defects in the vehicle, of which he had actual or constructive notice, and (4) operate his motor vehicle in a careful and prudent manner and in compliance with the statutory rules of the road. 13 C.J.S. 1262, sec. 678·(d) ; 9 A.J. 435, sec. 10 (see cases cited in notes) ; 2 Torts A.L.I., sec. 392 ; 21 A.L.R. 2d 916.

Did defendants breach these duties which they owed the plaintiff on the day in question as a result of which plaintiff suffered the personal injuries disclosed by the record?   This is the decisive question posed by this appeal.   A majority of the court is constrained to answer in the negative.

The oft-repeated rules controlling the consideration of an assignment of error directed to the denial of a motion to dismiss an action as in case of nonsuit have become axiomatic.   It would serve no useful purpose to repeat them here.   It suffices to say we have them in mind.

We may observe, however, that defendants offered no testimony, and therefore the rule defining the extent to which the testimony of the defendant may be considered on a motion for an involuntary nonsuit has no application here.

The evidence in this case does not invoke the application of the *res ipsa loquitur* doctrine.   We need not discuss that contention of plaintiff further than to say that plaintiff himself undertakes to point out at least two reasons why the door to the ambulance suddenly opened.   Hence *Etheridge v. Etheridge,* 222 N.C. 616, 24 S.E. 2d 477, and the other like cases cited by him are clearly distinguishable.   *Rushing v. Mulhearn Funeral Home,* 200 So. 52.

The plaintiff offered testimony tending to show that the extra or special dowel pin lock was in a state of bad repair, and defendants admit it was not in use on the day plaintiff was injured.   Was its defective condition or nonuse the proximate cause of the mishap as alleged by plaintiff?

Plaintiff relies upon the assertion, which he contends is a reasonable conclusion, that the defect in, or nonuse of the dowel pin lock would cause the patient compartment door to open suddenly in the event of heavy pressure on the door.   This is a *non sequitur*.   The conventional door-locking mechanism held the door closed.   The automatic appliance locked it from the driver's seat so that it could not be opened by anyone in the patient compartment.

Every automobile has a regular door lock and latch mechanism on its doors. This mechanism is provided, in part, to keep the door closed while the automobile is in motion. In addition there is provided in connection with each door lock a "push button" device which may be used to lock the door from the inside.

Such was the case on the ambulance being used by defendant at the time plaintiff received his injuries. It had on the patient compartment door a regular conventional door lock and latch mechanism such as is provided for and may be found on all Cadillac automobiles.

There is not a particle of evidence in the record tending to show that this conventional mechanism found on all Cadillac and other automobiles was defective or in a state of bad repair. Instead, all the testimony relating thereto tends to show it was not defective but adequately served the purpose for which it was intended. And it is a matter of common knowledge that it is this mechanism that keeps the door closed while a motor vehicle is in motion. Locking devices serve another purpose.

"The catches on that door are exactly the same as you'd have on a Cadillac or most any General Motors automobile. They have two catches on them. There is a groove catch and also the latch catch and the latch catch has a safety catch on it too. . . . There is no safety device other than the regular conventional Cadillac door latch. That's all any automobile has. . . . Jar or vibration will not cause the door to come unlatched any more so than it would on a regular automobile. I'll say there is as much chance of that door flying open from the jar as there would be on your car or my car or anybody else's automobile . . ."

Since there was no defect in the conventional lock and latch mechanism, there was no danger created by any defect in the mechanism which held the door closed while it was in motion, notice of which had been brought home to defendant and of which he should have warned plaintiff. Anno. 21 A.L.R. 2d 916. Nor is there any evidence tending to show that the door would open when someone leaned his weight against it. *Rushing v. Mulhearn Funeral Home, supra; Everett v. Evans,* 207 S.W. 2d 350.

So then, it is just as reasonable to surmise that plaintiff voluntarily opened the door and threw out a cigar or cigarette butt or other waste material as it is to "infer" that plaintiff was suddenly thrown against the door, causing it to fly open. Either conclusion rests on pure speculation. *Everett v. Evans, supra.*

The plaintiff further insists there was a patched place in the highway; that when the ambulance passed over this place at a high rate of speed it caused a jolt or jar which either caused the door to open or threw plaintiff against it with such force as to cause it to open. This position is untenable, in the first place, for the reason there is no evidence the patched place existed on the day of the accident. In the second place, if

we concede that it did then exist, there is no evidence tending to show that it was either elevated above or depressed below the surface of the road so as to disturb the even tenor of a motor vehicle passing over it.

Lastly, the plaintiff urges the view that the seat furnished him was small and so arranged that a man of his size seated in it had his hip pressed against the door and the door handle in such manner that the jarring and swaying of the ambulance when operated at a high rate of speed would cause his hip to slip or slide against the handle and thus open the door. This position would be quite plausible and might support an inference of negligence if the door could be opened by pressing the handle toward the rear of the ambulance. But such is not the case. Plaintiff was seated with his back to the driver's seat, facing the rear. If a sudden jar caused him to slip down in his seat, his hip would press against the regular door lock handle. But on this record that would only tend to brace the handle and keep it from turning—this for the simple reason the handle had to be pulled forward toward plaintiff in order to open the door.

"It (the seat) is right beside the arm rest on the door. The latch (door handle) inside the door is perpendicular and when you sit in that seat the latch strikes you approximately at your hip. . . . In order to move that latch you have to move your body, reach under and pull the latch toward the front of the ambulance. . . . In order to reach this handle you would have to reach up under the arm rest." And another witness testified to the same effect. "The latch is perpendicular as shown in the picture. In order to open the door the latch must be pulled forward. . . . The bottom part of the latch moves toward the front of the ambulance."

The very multiplicity of possible reasons why the door opened, advanced by plaintiff, merely serves to emphasize the speculative nature of the testimony. There is no evidence in the record to support the inference that the accident was a natural and probable consequence of the defective condition of the automatic door-locking appliance. Just why it did open, in the light of the fact there was no defect in the regular door lock and latch mechanism, is a matter of speculation.

In effect the case comes to this: The plaintiff alleges and proves a defect in a special locking device—not in use at the time of the accident— and was permitted to recover in the court below on the theory that the defect in, or nonuse of, this device created a special hazard, notwithstanding the testimony that the door was equipped with the conventional door lock and latch upon which all motorists rely to keep the doors closed while their vehicles are in motion, and that this mechanism was in good working order so that "you had to use the handle to open it."

The record presents one of the tragedies of life. Plaintiff suffered grave injuries which affect his mind and from which he will not recover.

Yet this does not warrant a judgment against the defendant unless these injuries are the proximate result of his negligence. As we read the record, there is no evidence that would warrant this conclusion.

For the reasons stated the judgment below must be

Reversed.

ERVIN, J., dissenting: According to my interpretation of the case on appeal, the evidence of the plaintiffs is sufficient to support the conclusion that the pitiful plight of their ward, W. S. Pemberton, is the natural and probable consequence of the virtual refusal of the defendants to keep in proper repair a simple safety appliance of a type in general and approved use on ambulances. In consequence, I cannot join in the decision holding that in no view of the testimony can the defendants be deemed guilty of actionable negligence. The reasons which prompt my dissent are set forth below.

The decisions explaining how the court determines whether the evidence is sufficient to withstand a motion for compulsory nonsuit in a case where the defendant offers no evidence are well-nigh as numerous as the "autumnal leaves that strow the brooks in Vallombrosa." According to these decisions, the court must do these things in performing this judicial task:

1. The court must take it for granted that the plaintiff's evidence is true, and give the plaintiff the benefit of every favorable inference which his evidence fairly supports. *Graham v. Gas Co.,* 231 N.C. 680, 58 S.E. 2d 757; *Higdon v. Jaffa,* 231 N.C. 242, 56 S.E. 2d 661; *Hughes v. Thayer,* 229 N.C. 773, 51 S.E. 2d 488.

2. The court must resolve all conflicts and discrepancies in the evidence in the plaintiff's favor. *Sanders v. Hamilton,* 233 N.C. 175, 63 S.E. 2d 187; *Jackson v. Hodges,* 232 N.C. 694, 62 S.E. 2d 326; *Barlow v. Bus Lines,* 229 N.C. 382, 49 S.E. 2d 793; *Bank v. Ins. Co.,* 223 N.C. 390, 26 S.E. 2d 862; *Edwards v. Junior Order,* 220 N.C. 41, 16 S.E. 2d 466; *Dozier v. Wood,* 208 N.C. 414, 181 S.E. 336; *Lincoln v. R. R.,* 207 N.C. 787, 178 S.E. 601.

3. The court must deny the motion to nonsuit if it appears that a recovery can be had by the plaintiff upon any view of the facts which the evidence as thus interpreted reasonably tends to establish. *Graham v. Gas Co., supra; Cox v. Hinshaw,* 226 N.C. 700, 40 S.E. 2d 358; *Gorham v. Insurance Co.,* 214 N.C. 526, 200 S.E. 5; *Diamond v. Service Stores,* 211 N.C. 632, 191 S.E. 358.

When the plaintiffs brought this action against the defendants, they assumed the burden of producing evidence sufficient to establish the three essential elements of actionable negligence, namely: (1) That the defendants were under a legal duty to protect the plaintiffs' ward against injury;

(2) that the defendants failed to perform that duty; and (3) that such failure was the proximate cause of injury to the plaintiff's ward. *Holderfield v. Trucking Co.,* 232 N.C. 623, 61 S.E. 2d 904; *Hammett v. Miller,* 227 N.C. 10, 40 S.E. 2d 480; *Truelove v. Railroad,* 222 N.C. 704, 24 S.E. 2d 537; *Gold v. Kiker,* 216 N.C. 511, 5 S.E. 2d 548; *Ellis v. Refining Co.,* 214 N.C. 388, 199 S.E. 403.

A consideration of the question whether the plaintiffs have satisfied the requirement of the law in this respect necessitates some statement of their evidence. It conduces to convenience of narration to call the plaintiffs' ward, W. S. Pemberton, and the defendants, J. L. Lewis and Richard Gordon, by their respective surnames.

The first inquiry which arises is whether the evidence suffices to show the existence of the first essential element of actionable negligence, namely: That the defendants were under a legal duty to protect Pemberton against injury. The testimony relevant to this inquiry is summarized in the next paragraph.

Lewis, a mortician at Tabor City, North Carolina, owned a combination motor ambulance and hearse, which he used on special occasions to transport patients and persons ministering to them from one place to another for hire. Lewis employed Gordon to drive this vehicle, which is hereinafter designated as an ambulance. On 27 October, 1949, Lewis and Pemberton entered into an express contract whereby Lewis obligated himself to have Gordon transport Pemberton and Pemberton's sick son in the ambulance from Tabor City to Roanoke, Virginia, where Pemberton's son was to be placed in a hospital, and whereby Pemberton bound himself to pay Lewis a stipulated compensation for such transportation. The tragic event giving rise to the present litigation occurred while Gordon was carrying out this contract.

This evidence compels an affirmative answer to the first inquiry. It discloses that Lewis was a private carrier of passengers for hire, *i.e.,* one, who, without being engaged in such business as a public employment, undertakes by way of special contract to transport persons in a particular case for hire. Blashfield's Cyclopedia of Automobile Law and Practice, sections 2141, 2141.5; 13 C.J.S., Carriers, section 531. It also shows that at the time named in the pleadings the relation of private carrier and passenger existed between Lewis and Pemberton, and Gordon was employed by Lewis to perform the obligations which Lewis owed Pemberton by virtue of that relationship.

A private carrier of passengers for hire is under the legal duty to exercise ordinary care to transport his passengers safely, and is liable to them for personal injuries proximately resulting from his negligence in failing to exercise such care. *Forbes v. Reinman,* 112 Ark. 417, 166 S.W. 563, 51 L.R.A. (N.S.) 1164; *Duffy v. J. W. Bishop Co.,* 99 Conn.

573, 122 A. 121; *Lazor v. Banas,* 114 Pa. Super. 425, 174 A. 817; *Campbell v. Campbell,* 104 Vt. 468, 162 A. 379, 25 A.L.R. 626; *Garrett v. Hammack,* 162 Va. 42, 173 S.E. 535; Blashfield's Cyclopedia of Automobile Law and Practice, section 2271; 9 Am. Jur., Carriers, section 10; 13 C.J.S., Carriers, section 678d. When a private carrier undertakes to transport passengers by motor vehicle for hire, his legal duty to exercise ordinary care for their safety imposes upon him these specific obligations: (1) To exercise reasonable care to supply a motor vehicle reasonably safe for the carriage of his passengers; (2) to subject his motor vehicle to reasonable inspection to discover defects in it; (3) to warn his passengers of nonapparent dangers which he actually or constructively knows are involved in the use of his motor vehicle; and (4) to drive his motor vehicle on the highway at a speed which is reasonable and prudent under the existing conditions. The American Law Institute's Restatement of the Law of Torts, Volume 2, Negligence, section 392; G.S. 20-141 (a).

This brings us to the question whether the evidence suffices to show the existence of the second essential element of actionable negligence, to wit: That the defendants failed to perform their legal duty to protect Pemberton against injury. The answer to this query is to be found in the testimony bearing on the character of the vehicle as well as in that relating to the conduct of the defendants.

The conveyance was a "1947 Miller body Cadillac" ambulance. Transparent slide bars or windows divided the ambulance into two compartments: a front one, where the driver sat; and a rear one, where the patient and his attendant rode. The left-hand half of the rear compartment was fitted with a cot for the patient and the right-hand half was equipped with two seats for the attendant, one of them being a front seat, which faced backwards, and the other being a rear seat, which faced forwards. The ambulance had five doors, two on each side and one at the back. The two foremost side doors afforded access to the front or driver's compartment, and the other three doors furnished entrance to the rear or patient's compartment. The right side door to the front compartment, which is hereafter called the driver's door, was hinged at its front, and the right side door to the rear compartment, which is hereafter designated as the patient's compartment door, was hinged at its rear.

When the ambulance was put on the market by its manufacturer and purchased by Lewis, it was equipped with two mechanisms to secure the patient's compartment door when such door was closed. One of them was a conventional door-catch or latch similar to that in common use on ordinary passenger-carrying automobiles, and the other was an automatic door-locking appliance, which was of a type in general and approved use upon ambulances, and which was designed to enable the driver to prevent

PEMBERTON *v.* LEWIS.

the patient's compartment door from opening while the vehicle was in motion. When this automatic door-locking appliance was in operating condition, it automatically locked the patient's compartment door whenever the driver's door was closed so that the patient's compartment door could not be either accidentally or intentionally opened from either the inside or the outside while the driver's door remained closed.

Although the majority opinion does not expressly so state, it does intimate that the patient's compartment door was also equipped with a third door-closing mechanism, namely, a "push button device" similar to that in use on ordinary passenger-carrying motor vehicles. According to my reading of the case on appeal, this intimation cannot be reconciled with the testimony of Harry Mashburn, the only witness queried on the matter. He stated that the ambulance did "not have that catch on it." The majority opinion calls the automatic door-locking appliance "the dowel pin lock" and makes this observation: "Just when the dowel pin lock was installed is not clear." According to my interpretation of the case on appeal, this statement is based on a misconstruction of the testimony of A. J. Inman, a mechanic residing near Tabor City, who is briefly quoted in the majority opinion. When Inman's evidence is read aright in its entirety, it shows that he made repairs on the ambulance subsequent to Pemberton's injury, and that he was talking about a new automatic door-locking appliance which he put on the vehicle at that time. Besides, the statement is wholly inconsistent with the testimony of V. C. Ward and Harry Mashburn. Ward stated that he was employed by Lewis prior to January, 1949; that he drove the ambulance in question; that the ambulance was equipped with the automatic door-locking appliance when "they first got it"; that the appliance soon fell into disrepair; and that it was not in operating condition when he left the employ of Lewis approximately ten months before the accident. Mashburn testified that he was a salesman for the A. J. Miller Company, which sold Miller body Cadillac ambulances; that the automatic door-locking appliances were put on such ambulances by the manufacturer; and that similar door-locking appliances, "either automatic or hand operated," had been in general and approved use on ambulances ever since the vehicle in question was made.

The front seat in the rear compartment, which is hereafter called the passenger seat in deference to the nomenclature of the majority opinion, was adjacent to the patient's compartment door. The conventional door-catch or latch securing this door when closed was controlled or operated on the inside by a perpendicular inside door-handle made of metal. This door-handle was hinged at its top to the inside of the door just below an arm-rest, which was attached to the inside of the door at a point "approximately ten inches above the level of the (passenger) seat." The potential movement of the inside door-handle was limited. It would turn one

way only, *i.e.*, upwards toward the front of the ambulance for a space not exceeding a quarter of a circle. Whenever the inside door-handle was turned by any force, whether accidentally or intentionally applied, to any appreciable extent in the only direction in which it could move, *i.e.*, upwards, and forward in an arc, it disengaged the conventional door-catch or latch securing the patient's compartment door. For this reason, such movement of the inside door-handle would cause the door in question to open if the driver's door was not closed *or* if the automatic door-locking appliance was not in operating condition. Inasmuch as the patient's compartment door was hinged at its rear, its certain and speedy opening was insured by the inevitable friction generated by the forward movement of the ambulance in case the conventional door-catch or latch became disengaged while the vehicle was in motion and the automatic door-locking appliance was not in operating condition.

The passenger seat was small in area and hard in composition. When the attendant ministering to a patient rode in this seat, he necessarily traveled backwards with his left thigh and knee virtually under and against the lower and moveable end of the inside door-handle which controlled the conventional door-catch or latch securing the patient's compartment door. His left elbow, forearm and hand were in constant danger of forcible contact with the door-handle, regardless of whether he placed them on the arm rest or elsewhere. There was no substantial object within his reach which he could grasp to keep from sliding about on the seat, or to steady his body against any external force occasioned by the movement of the ambulance.

The automatic door-locking appliance fell into disrepair and ceased to operate at least as early as January, 1949. Neither Lewis nor Gordon made any effort to restore it to operating condition.

When Pemberton presented himself and his son to Gordon at Tabor City on 27 October, 1949, for transportation to Roanoke, Virginia, pursuant to his contract with Lewis, Gordon put Pemberton's son, who was in a comatose state, upon the cot in the rear compartment of the ambulance, and permitted Pemberton to occupy the passenger seat in such compartment for the purpose of ministering to his unconscious son while the vehicle was en route to Roanoke. Gordon closed the door of the ambulance before he put the vehicle in motion. Neither Lewis nor Gordon warned Pemberton that the automatic door-locking appliance was in disrepair, and that in consequence there was danger that the door beside his seat would be opened while the ambulance was in motion in case the pressure of any part of his body on the lower and movable end of the door-handle caused the door-handle to turn in the only direction in which it could move, *i.e.*, upward and forward in an arc, to any appreciable extent. Inasmuch as the defective state of the automatic door-

PEMBERTON v. LEWIS.

locking appliance was not visible to a passenger, the defect and the result-
ant danger were not open to ordinary observation.

While the ambulance was "running very fast" along a highway in
Guilford County, North Carolina, the door beside the seat occupied by
Pemberton suddenly opened, and Pemberton fell from the ambulance,
which dragged him along the highway for 300 feet and thereafter con-
tinued on its way for an additional 300 feet before Gordon brought it
to a standstill. As a consequence of the opening of the door and his
resultant fall, Pemberton suffered injuries, which disabled him mentally
as well as physically and necessitated the appointment of the plaintiffs
as his guardians.

The only witness to see the ambulance at the precise moment of the
accident was Mrs. Rebecca Ward, who said "it appeared to be running
very fast." The statement in the majority opinion that the vehicle was
proceeding at about fifty-five miles per hour at that time is based on the
evidence of State Highway Patrolman Lane, who testified that he ques-
tioned Gordon on the day of the accident and that Gordon "said he was
doing about fifty-five miles an hour." There is nothing in the record to
indicate that Gordon was seeking to merit the praise bestowed by the
Psalmist upon the person "that sweareth to his own hurt and changeth
not" at the time he undertook to explain to the patrolman the circum-
stances surrounding the critical injury to his passenger. Inasmuch as the
rear view mirror afforded Gordon a reflected view of the entire rear
compartment at all times, the fact that the ambulance overshot the point
where the door opened by 600 feet before it was brought to a standstill is
sufficient to warrant the conclusion that the speed of the vehicle far
exceeded the estimate of its driver. Blashfield's Cyclopedia of Automobile
Law and Practice, section 6560.

A. J. Inman testified that he made certain experiments in the ambulance
in question while the action was being tried in the court below; that he
sat in the passenger seat beside the patient's compartment door in the
rear compartment when the automatic door-locking appliance "was off"
and the conventional door-catch or latch "was on"; that he turned on the
seat so as to bring his elbow and knee into contact with the door-handle;
and that "the door opened up" whenever his elbow or knee came into
contact with the door-handle.

The majority of the court and I reach diametrically opposite conclu-
sions on this phase of the case. They hold that the evidence is wholly
insufficient in any view to justify a finding that the defendants breached
any one of the four specific obligations inherent in their legal duty to
exercise ordinary care to transport Pemberton safely.

If I read the majority opinion aright, it is based on the portion of the
testimony of Harry Mashburn quoted in the twelfth paragraph of the

opinion and these additional considerations: (1) That the ambulance was equipped with the conventional door-catch or latch found on all ordinary passenger-carrying automobiles; (2) that such conventional door-catch or latch was free from defect; and (3) that "it is a matter of common knowledge that it is this mechanism (*i.e.,* the conventional door-catch or latch) that keeps the door closed while a motor vehicle is in motion."

When the additional considerations motivating the decision of the majority are analyzed, they come to this: The evidence compels the single conclusion that the defendants fully performed their legal duty to exercise ordinary care to transport Pemberton safely by furnishing an ambulance which had no door-securing device whatever except the conventional door-catch or latch found on all ordinary passenger-carrying automobiles. I am unable to perceive how all the testimony in this cause drives the reasoning faculty to this solitary conclusion. A passenger in an ordinary passenger-carrying motor vehicle sits on a soft and comparatively commodious seat, faces to the front, is held in place by the forward motion of the conveyance, and is not in virtual contact with the lower and moveable end of the inside door-handle. It is a far cry from the circumstances surrounding the passenger in the ordinary passenger-carrying automobile to those which encircled Pemberton in the defendants' ambulance. This being true, the evidence admits of the finding that the conventional door-catch or latch was wholly insufficient to keep the ambulance door closed while that vehicle was in motion, even though it may have been sufficient to secure the door of an ordinary passenger-carrying automobile while it was in motion.

The majority opinion candidly concedes that the plaintiffs' testimony tends to show that the automatic door-locking appliance "was in a state of bad repair" and that "the defendants admit it was not in use" on the day Pemberton was injured. The opinion dismisses this testimony and this admission with the declaration that they have no bearing whatever on the question whether the defendants breached their legal obligation to exercise reasonable care to supply a motor vehicle reasonably safe for the carriage of Pemberton. The declaration of the majority rests on the theory that the automatic door-locking appliance was not designed to keep the patient's compartment door closed while the ambulance was moving, but that, on the contrary, it served "another purpose." The majority does not undertake to tell us what this other purpose was, or to explain why the manufacturer failed to put similar door-locking appliances on the other two doors of the rear compartment, which happened not to be adjacent to either of the seats provided for attendants. While Harry Mashburn did testify that "jar or vibration will not cause the door to come unlocked any more so than it would on a regular automobile," he

did not deny the validity of the plaintiff's theory of the case. He said: "I never did get in . . . and see if I could open it with my elbow or my knee."

In my judgment, the testimony reasonably warrants this conclusion: The manufacturer of the ambulance appreciated the somewhat obvious fact that the conventional door-catch or latch was insufficient to secure the patient's compartment door while the passenger seat was occupied by an attendant, and installed the automatic door-locking appliance for the precise purpose of safeguarding an attendant riding on that seat from the very mishap which befell Pemberton.

Moreover, the evidence fairly supports these inferences on the present phase of the case:

1. The automatic door-locking appliance was defective, creating the danger that the door adjacent to the seat occupied by Pemberton would suddenly open in case the movement of the ambulance caused his body to come into forcible contact with the lower and moveable end of the inside door handle.

2. The danger was known to Lewis and Gordon, or had existed for such a time that they would have known of it had they subjected the ambulance to reasonable inspection.

3. The danger was not apparent to Pemberton, who was justifiably ignorant of it. Neither Lewis nor Gordon gave Pemberton any warning of his peril.

4. Gordon undertook to carry Pemberton and his son along the highway at an imprudent and unreasonable speed notwithstanding the tendency of such speed to cause Pemberton's body to come into forcible contact with the lower and moveable end of the inside door-handle.

This being true, the testimony suffices to establish that the defendants failed to exercise ordinary care to transport Pemberton safely.

This brings me to the final question whether the evidence is sufficient to show the existence of the third essential element of actionable negligence, namely: That the failure of the defendants to exercise ordinary care to transport Pemberton safely was the proximate cause of his injuries.

The majority of my brethren adjudge with complete finality of conviction that this inquiry must be answered in the negative. Their opinion lays hold on the evidence that the inside door handle "had to be pulled" toward the front of the ambulance to open the patient's compartment door, and declares that it was logically impossible for any external force occasioned by the movement of the ambulance to cause Pemberton's body to push the door-handle in that direction. I entertain grave misgivings as to the validity of the thesis that a judicial tribunal can expect observance of the precepts of logic by such an illogical thing as an accidental

external force. It can certainly be argued with much show of reason that such a force partakes of the nature of the mule, which "don't kick according to no rule." Be this as it may, the evidence reveals facts which ought to satisfy the logician as well as the jury that the accident in question could have happened in exactly the way in which the plaintiffs allege it did happen.

The evidence that the inside door handle "had to be pulled" toward the front of the ambulance to open the patient's compartment door does not imply that such door handle had to be pulled or pushed directly toward the front of the vehicle. Indeed, it could not move in that precise direction. Its lower and moveable end traveled in one way only, *i.e.,* upward and forward in an arc. As a consequence, the patient's compartment door could· be opened by any pressure which turned the lower and moveable end of the door handle upward and forward. Manifestly, such a pressure could be caused by a force moving either upward or forward. The notion of the majority that any movement of Pemberton's body was necessarily in the direction of the rear of the ambulance ignores various important factors. One of them is that Pemberton instinctively pressed his body backward towards the front of the ambulance to counteract the tendency of the forward-motion of the vehicle to propel him towards the rear, and another is that the external force occasioned by the motion of the ambulance would bounce Pemberton upwards or impel him backwards or forwards or sideways, depending upon the origin and direction of the force and its interaction with Pemberton's instinctive reaction. These things being so, the external force occasioned by the motion of the ambulance could bring Pemberton's elbow or knee or thigh into forcible contact with the lower and moveable end of the inside door handle in such a manner as to turn such end of the door handle upwards and forwards, causing the door to open.

My brethren assert finally that the evidence leaves all questions arising in the case shrouded in mystery. They say that it is just as reasonable to "surmise" that Pemberton voluntarily opened the door as it is to "infer" that his body was brought into forcible contact with the lower and moveable end of the door handle by the movement of the ambulance, causing the door to open.

The testimony discloses that Pemberton was a mature man in the full possession of all his mental faculties before he fell from the moving ambulance. It is certainly not reasonable either to infer or to surmise that a reasonable man will do such an unreasonable thing as voluntarily to open the rearward-hinged door of a motor vehicle while it is being driven along the highway at a high speed.

The evidence does not entomb this case among the law's unsolved riddles. Indeed, it justifies the incontrovertible assertion that the plain-

tiff's ward could not possibly have suffered his disabling injuries had the defendants maintained the automatic door-locking appliance in proper condition.   Moreover, it warrants these final inferences on the third phase of the case:

1. The movement of the ambulance brought Pemberton's body into forcible contact with the lower and moveable end of the inside door handle, causing the door to open and Pemberton to fall from the moving ambulance to his injury.

2. The mishap was the natural and probable consequence of the defective condition of the automatic door-locking appliance, the neglect of Lewis and Gordon to warn Pemberton of the resultant danger, and the speed of the ambulance.

For the reasons given, the evidence of the plaintiffs is sufficient to establish that Lewis was a private carrier of passengers for hire; that he and his driver Gordon were negligent in that they failed to exercise ordinary care to carry their passenger Pemberton safely; and that their negligence was the sole proximate cause of the injuries sustained by Pemberton.

In consequence, I vote to uphold the judgment of the trial court.