LAURA CROWELL v. EASTERN AIR LINES, INC., AND CITY OF CHARLOTTE.

(Filed 7 April, 1954.)

**1. Carriers § 3—**

Interstate air transportation is regulated in accordance with the provisions of the Civil Aeronautics Act. 49 U.S.C., Sec. 401, *et seq.*

**2. Carriers §§ 4, 21c—**

An interstate Air Line is required to file with the Civil Aeronautics Board only such rules, regulations and practices as affect rates or services under such rates, 49 U.S.C., Sec. 483 (a), and a time limitation as to filing notice of claim and institution of action for negligent injury to a passenger relates to an act of the passenger and not to service of the carrier and is neither required nor authorized to be filed with the Board by the statute.

**3. Carriers § 21c—**

A statement printed on the ticket folder that the carrier had set forth in its tariffs notice of time limits for filing claim and institution of suit for personal injury will not bar a passenger's action instituted within the limitation of G.S. 1-52 (5) when it appears that the carrier had actual notice of the injury at the time it occurred, that the tariffs were filed only with the Civil Aeronautics Board, and that the passenger, though a habitual traveler by air, had never read on any ticket sold her such limitation, it being necessary that such limitation be distinctly declared and deliberately accepted in order to be effective.

**4. Carriers § 21c—**

While an air line is not an insurer of the safety of its passengers, it is under duty to furnish a passenger with a reasonably safe passageway from the waiting room of the airport to its airplane, and this irrespective of any terms in the lease of the airport.

**5. Same—**

Evidence tending to show that a passenger on her way to board a plane had the heel of her shoe caught by a worn and loose threshold board of the door leading to the loading platform, *held* sufficient to overrule the carrier's motion to nonsuit, both on the issue of negligence and the issue of contributory negligence.

**6. Appeal and Error § 6c (5)—**

Assignments of error to the charge which do not point out the alleged error are ineffectual.

**7. Trial § 36—**

Where the issues submitted are sufficient to support the judgment disposing of the whole case, the refusal of the court to submit issues tendered will not be held for error.

**8. Contracts § 7e—**

Contracts indemnifying one against his own negligence are strictly construed.

**9. Carriers § 21c: Municipal Corporations § 8c—**

Stipulation in a lease concerning a municipal airport that the municipality should keep the airport facilities in good repair does not excuse a lessee air line from its duty to provide passengers with a reasonably safe passageway to its planes, and such provision will not support an air line's claim for indemnity against the city for injury to a passenger caused by a fall when the passenger's heel was caught by a worn and loose threshold board while she was on her way to board a plane.

**10. Appeal and Error § 8—**

An appeal and appellant's exceptions will be considered in the light of the theory of trial in the lower court.

**11. Appeal and Error § 6c (5½)—**

Where a defendant tenders no issue as to primary and secondary liability and the cause is not tried upon this theory in the lower court, appellant may not object to the failure of the court to submit such issue.

**12. Negligence § 8—**

The doctrine of primary and secondary liability is based upon a contract implied by law from the fact that a passively negligent tort-feasor has discharged an obligation for which the actively negligent tort-feasor was primarily liable.

**13. Quasi-Contracts § 1—**

There can be no implied contract where there is an express contract between the parties in reference to the matter.

**14. Carriers § 21c: Municipal Corporations § 8c—**

 Where the lease of a municipal airport requires the city to keep the facilities in repair, but expressly provides that the lessee air line should indemnify and save the city harmless from any liability arising from the negligence of the air line or its agents and employees, *held*, the air line may not assert the defense of primary and secondary liability for an injury resulting to a passenger from a fall over a loose and worn threshold board while the passenger was on her way to board a plane, since the duty to provide a reasonably safe passageway for its passengers rests upon the carrier, and therefore the injury resulted from negligence of the carrier in failing to perform this duty.

BOBBITT, J., took no part in the consideration or decision of this case.

APPEAL by Eastern Air Lines, Inc., from *Pless, J.,* Regular May Civil Term 1953 of MECKLENBURG.

Civil action to recover damages for personal injuries suffered by the plaintiff, when in attempting to pass through a door of the waiting room of the Municipal Airport at Charlotte to go onto the loading ramp to board as a passenger an airplane of the Eastern Air Lines, Inc., she fell by reason of the heel of her left foot being caught on the threshold board, which was in an allegedly dangerous, loose and badly worn condition. The plaintiff alleged in her complaint the condition of the threshold board was

due to the joint and concurring negligence of the defendant Eastern Air Lines, Inc., and of the defendant the City of Charlotte.

The plaintiff offered evidence tending to show these material facts. In stating these facts Eastern Air Lines, Inc. will be called Air Lines, and the City of Charlotte the City.

On 29 June 1950 the plaintiff, a lady 63 years old, was a dietitian and food supervisor for the S. & W. Cafeterias. Her duties as such employee included traveling at all times to their cafeterias located in eight cities from Washington, D. C., to Atlanta, Georgia. On 29 June 1950 the plaintiff went to the City's Municipal Airport to take the 8:05 a.m. flight of Air Lines for Roanoke, Virginia, where there is an S. & W. Cafeteria. The plaintiff lived in Charlotte. For 5 years prior to June 1950 the plaintiff, as dietitian of the S. & W. Cafeterias, has traveled to the seven cafeterias of her employer located in other cities than Charlotte by air, averaging six, eight or nine trips a month. Each time she left from the City's Municipal Airport, using the same waiting room and the same door to the loading ramp to the airplanes where she fell on 29 June 1950.

On 29 June 1950 Air Lines was a common carrier for hire, carrying passengers in interstate and intrastate commerce. Plaintiff had bought a ticket from Air Lines for transportation to Roanoke, Virginia. She checked her baggage on her ticket and waited in the lobby for the flight to be called.

When the flight was called, the plaintiff started out the west door of the lobby leading to the ramp, where the airplane was waiting. This door is customarily used to go to the Air Lines' airplanes. The plaintiff knew of no other door provided by Air Lines for passengers to board their planes. This door had screen doors, which opened outside toward the ramp, and had to be held open by a person going through. The level of the lobby floor and the ramp is different. A person going over the threshold steps down on a little platform, takes a step or two on that, and then steps down another step on the concrete. The lobby floor is 18 or 20 inches, or maybe two feet, above the concrete platform outside.

The plaintiff had a hatbox on her arm and also a pocketbook. She pushed both screen doors open to make a wide exit, then stepped down with her right foot, and started to step over with her left foot, when the heel of her left foot caught on the threshold. She testified: "I tried to get it loose, and some way it slipped, then went right on down to the edge of the doorsill there and hung practically straight down like that. I couldn't get it loose at all. I realized I couldn't get it loose, and I tried to find something to hold on to. When my heel caught on the threshold, it carried me off my balance. I couldn't get straightened up, couldn't get my foot loose of whatever it was on, then it did slip and that heel caught. The back of my heel was up against the edge of the sill, the door. When

I stepped down with my right foot, my left foot was resting on the threshold board, and my heel got caught in that position. When I tried to step down with my left foot, my foot slipped and then hung tight. It slipped forward and then went off the edge of the sill. I fell on down that little platform, and then rolled on down to the concrete." The threshold board was raised above the floor level some fraction of an inch—located several inches in or toward the inside of the waiting room from the doorsill which protruded out beyond that. There was no handrail, nor anything one could reach as one steps out of the waiting room door, if one were falling, to break the fall. When the screen doors are closed, there is not a very good view of the threshold board. Plaintiff testified also: "After my foot first became caught on this threshold board, I tried to pull it loose. I was very conscious of trying to get it off. I tried to raise it up, and pull it forward. I tried everything. After I got it loose, it just slipped further down, slipped on down. I don't know about how far it slipped further down; probably a couple of inches—it was some fraction of a foot." Plaintiff admitted on cross-examination that she testified on a pre-trial examination that she was not looking down when she went out the door.

O. C. Taylor, a witness for the plaintiff, gave testimony tending to show these facts: In June 1950 he was a dispatcher at the airport, and had been working there two years. The threshold board at the door where plaintiff fell was old. It was less than an inch thick. This board in the middle and each end was all right, but in the center at the middle of each door it was worn down. At one place the board was warped and real narrow. If one stepped on the board, it would not stay firm. It would raise up. He did not see the plaintiff fall. He saw the board afterwards during the day she fell. It was not fastened down, and he had the board tacked down. When one looked at the board, its loose or wobbly condition was not necessarily apparent. The board had been getting worse and worse, thinner and thinner, ever since he had worked there, though he couldn't say how long the looseness of the board had existed. This board puckered up where it was worn.

Alphonse Kearns, a witness for the plaintiff, gave testimony tending to show these facts. On 29 June 1950 he was a janitor at the airport; he did not see plaintiff fall; but when she was in the ambulance there, he went to the door. The threshold board was raised up in the middle of each door about a quarter of an inch—the part that was setting up was the edge of the board fronting the inside floor of the terminal. The board was loose. The linoleum or asphalt or other covering on the floor beside the threshold board was chipped out, worn out and ragged. When plaintiff was carried away in the ambulance, he nailed the threshold board down. Over the defendants' objections and exceptions, he testified that

about two months before he saw a lady fall out of this door onto the platform. When she fell, her shoe heel was torn off, and fell inside the waiting room about 15 inches from the threshold board. He looked then at the threshold board, and it was sticking up. If a person was walking out of this door and set his foot on the threshold board, and then shifted his weight forward to go out, it would tilt forward. He told Mr. Smith, an employee of the City, whose duties included taking care of repairs, about this lady having her heel torn off and falling, and that the threshold board was worn out, had raised up, and he had nailed it down one time. Smith said he would put a new one in, but did not. When this board was lying flat, an ordinary glance would not disclose it was loose. He nailed this board down twice. The board was about four and a half feet long.

The plaintiff's evidence further tended to show the following. Air Lines called an ambulance, refunded her ticket money, and then put her in the ambulance. The plaintiff received serious injuries. She offered in evidence a stipulation of medical, hospital and other expenses, and compensation paid by American Mutual Liability Insurance Co., showing medical expenses paid in the amount of $5,526.15, and compensation paid her for 73 weeks at $24.00 per week amounting to $1,752.00. At the time of her injury her salary was about $61.00 a week.

The defendant Air Lines offered evidence tending to show these facts: That the threshold board and the doorway had nothing wrong with them; that the threshold board was not loose; there was no separation between the carpet strip and the door; that plaintiff admitted in her pleadings she did not present in writing notice of the claim upon which her action is based to the Air Lines within ninety days after the alleged injury, nor formal notice of her claim within six months after 29 June 1950; plaintiff's action was commenced 13 October 1951; that plaintiff admitted in her pleadings that she and her employer were subject to and bound by the North Carolina Workmen's Compensation Act, and that the American Mutual Liability Insurance Company was compensation insurance carrier for the S. & W. Cafeterias on 29 June 1950; that plaintiff admitted in her pleadings that neither plaintiff nor the insurance carrier for S. & W. Cafeterias instituted any action against Air Lines until the present action was filed. Air Lines introduced in evidence certification of true copy on a form of the Civil Aeronautics Board, dated 22 January 1952, containing a certificate of B. R. Gillespie, Chief of the Tariff Section of said Board, and a further certificate of F. A. Toombs, Ass't. Secretary of said Board, and read this part of it: "General Rules, Paragraph 17, Claims, (A) Personal Injury and Death—Time Limitations. No action shall be maintained for any injury to or the death of any passenger unless notice of the claim is presented in writing to the general offices of the participating carrier alleged to be responsible therefor

within ninety days after the alleged occurrence of the events giving rise to the claim and unless the action is commenced within one year after such alleged occurrence." Air Lines then read Paragraph 8 from the ticket folder "The time limits for giving notice of claims and the institution of suit are set forth in Carrier's tariffs." The form and conditions of the ticket plaintiff bought on 29 June 1950 were identical with the tickets she bought from 1947 or 1948 on. Air Lines offered in evidence the lease concerning the Municipal Airport between the City and itself, which lease was in effect the day plaintiff fell.

The defendant Air Lines in its answer alleged that in the event the plaintiff recovers any judgment against it, then it, under the contract of lease concerning the Municipal Airport to it by the City, is entitled to be indemnified by the City.

The City offered no evidence.

At the conclusion of all the evidence the City moved for judgment of nonsuit.

At a pre-trial hearing before Sharp, Special J., an order was entered that the burden of proof is upon the plaintiff to show compliance with Section 59 of the Charter of the City that no action for damages against the City shall be instituted against the City, unless within ninety days after the happening of the injury complained of, the complainant, his administrators or executors shall have given written notice to its city council of such injury, or to prove any legally sufficient excuse for non-compliance with this charter provision. At this hearing the plaintiff admitted, that she had this burden of proof. Air Lines filed no exception to this ruling. The presiding judge at the jury trial "being of the opinion that the plaintiff has failed to repel the plea of the City with regard to notice," allowed the motion of nonsuit, and signed judgment accordingly.

The City replied to the cross-action of Air Lines that if the plaintiff recovered any judgment against it, it is entitled to be indemnified by the City, by pleading as a defense the failure of Air Lines to give notice to the City under its charter provisions. At a pre-trial hearing before Sharp, Special J., upon motion of Air Lines, this defense of the City was ordered stricken out, and the City excepted.

The City moved for judgment of nonsuit as to the cross-action of Air Lines against it for indemnification both at the conclusion of Air Lines' evidence, and at the conclusion of all the evidence. The court's ruling on this motion was deferred until after the verdict, and then the motion was granted.

The court submitted three issues to the jury: One, was the plaintiff injured by the negligence of Eastern Air Lines, Inc., as alleged?; Two, did the plaintiff, by her own negligence, contribute to her injury, as alleged?; Three, what damages, if any, is the plaintiff entitled to recover?

The jury answered the first issue "Yes"; the second issue "No"; and the third issue "$25,000.00."

From the judgment signed Air Lines appealed, assigning error.

*Jones & Small for Eastern Air Lines, Inc., Appellant.*

*Helms & Mulliss, James B. McMillan, and W. H. Bobbitt, Jr., for Laura Crowell, Appellee.*

*John D. Shaw and Robinson & Jones for City of Charlotte, Appellee.*

PARKER, J. The Air Lines appellant assigns as error the failure of the trial court to grant its motion for judgment of nonsuit, made at the close of plaintiff's evidence, and renewed at the close of all the evidence.

Its first contention in support of such motion is that plaintiff's action is barred for failure to file claim and bring suit in apt time as set forth in "General Rules, Paragraph 17, Claims, (A) Personal Injury and Death—Time Limitations."

The first question presented for our decision is whether under the Civil Aeronautics Act, and the Regulations of the Civil Aeronautics Board, Air Lines was required to file such a tariff rule.

Interstate air transportation is regulated in accordance with the provisions of the Civil Aeronautics Act, 49 U.S.C.A., Sec. 401, *et seq.* and Sec. 483, 49 U.S.C.A., which is entitled "Tariffs of Air Carriers" and which provides:

"(a) Every air carrier . . . shall file with the Board, (*i.e.* the Civil Aeronautics Board) . . . tariffs showing all rates, fares, and charges for air transportation between points served by it, . . . and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation (parenthesis ours). Tariffs shall be filed, posted, and published in such form and manner, and shall contain such information, as the Board shall by regulation prescribe . . ." It would seem that these portions of the Civil Aeronautics Act mean that classifications, rules, regulations, practices and services shall be filed with the Civil Aeronautics Board only to the extent required by regulations of the Board.

The regulations issued by the Board pertaining to tariffs of air carriers are contained in Parts 221 to 224, both inclusive, of the Economic Regulations of the Civil Aeronautics Board, Code of Federal Regulations. Part 221.1 in subsection (d) says: "Tariff means a publication containing rates applicable to the transportation of persons or property, and rules relating to or affecting such rates or transportation . . ." Part 221.4, entitled "Contents," sets forth matters which shall be included in tariffs filed by air carriers. This part or section provides in part: "Tariffs shall contain in the order named: (g) General rules which gov-

ern the tariff, *i.e.,* state conditions which in any way affect the rates named in the tariff, or the service under such rates."

It would appear that the time limitation as to filing notice of claim and institution of action is required to be filed only if this rule in any way affects the rates established by air carriers or the service under such rates. Therefore, it would seem that the sole justification for this time limitation is that it affects the services under such rates.

Webster's New International Dictionary defines "service" as "13. Act or means of supplying some general demand; as, railway service, telephone service, etc."

The Regulations of the Civil Aeronautics Board relating to tariffs apparently indicate their opinion of what the term "service" means. Subsection (h) of Part 221.4 of the said Economic Regulations provides that tariffs shall contain "a statement of charges for excess baggage, sleeper-service, and any other like services . . ." Subsection (c) of Part 221.5 refers to "ground transportation to or from airports or for pick-up and delivery service."

49 U.S.C.A., Sec. 483 (b) of the Civil Aeronautics Act speaks of service in connection with air transportation.

A number of cases decided under the Interstate Commerce Act indicate that the term "service" as used in the field of transportation is related to the transportation operations of a carrier. See *Cleveland, C. C. & St. Louis Ry. v. Dettlebach,* 239 U.S. 588, 60 L. Ed. 453; *Folmer & Co. v. Great Northern Ry. Co.,* 15 I.C.C. 33; *Berg Industrial Alcohol Co. v. Reading Co.,* 142 I.C.C. 161, 163; *Schultz-Hansen Co. v. Southern Pacific Co.,* 18 I.C.C. 234; *Wasie Common Carrier Application,* 4 M.C.C. 726, 729; *Union Transfer Co., Common Carrier Application,* 11 M.C.C. 194, 198; *Hughes, Contract Carrier Application,* 23 M.C.C. 563; *Jack Cole, Inc., Common Carrier Application,* 32 M.C.C. 199; *Lubbock-El Paso Motor Freight, Inc., Common Carrier Application,* 27 M.C.C. 585, 591.

The term "service" carries with it the concept of performance and supplying some general demand. The regulation as to time limitation to file notice of claim and to commence action requires the carrier to do nothing. The burden of this regulation rests entirely upon the passenger, and does not seem to be related to the transportation activities of the carrier or to the services it performs.

It would seem that the Civil Aeronautics Act does not require or authorize in the filed tariff the time limitation as to filing notice of claim and commencement of suit pleaded as a defense by Air Lines in this action and that such a provision is ineffective. It has been so decided in *Shortley v. Northwestern Air Lines,* D.C.D.C., 1952, 104 F. Supp. 152; *Thomas v. American Air Lines,* D.C.E.D. Ark., 1952, 104 F. Supp. 650;

*Toman v. Mid-Continental Airlines, Inc.,* D.C.W.D. Missouri, 1952, 107 F. Supp. 345. See also *Glenn v. Compania Cubana de Aviacion,* S.A. D.C.S.D. Fla., 1952, 102 F. Supp. 631. A very excellent and helpful discussion of the character of the tariff provision as a bar to actions here involved appears in an article "Airline Tariff Provisions As a Bar to Actions for Personal Injuries" by James C. McKay, published in Vol. 18, The George Washington Law Review 160 (1950). A different decision was reached in *State (Brandt) v. Eastern Airlines* (1948), D.C.S.D. N.Y.U.S. Av. Rep. 637; *Wilhelmy (now Stinech) v. N. W. Airlines,* D.C.W.D. Wash. 1949, 86 F. Supp. 565, and in *Herman v. Capitol Air Lines,* D.C.S.D.N.Y., 1951, 104 F. Supp. 955. See also *Meredith v. United Air Lines,* U.S.D.C. Cal.—1950, 1951, U.S. Av. Rep. 103; *Indemnity Ins. Co. of North America v. Pan American Airways* (1944), D.C.S.D.N.Y., 59 F. Supp. 338; *Sheldon v. Pan American Airways, Inc.,* 272 App. Div. 1000, 74 N.Y.S. 2d 267; 190 N.Y. Misc. Rep. 537, 74 N.Y. 2d 578 (1947).

Air Lines relies heavily upon the case of *Lichten v. Eastern Airlines, Inc.,* 189 Fed. 2d 939, and in its brief quotes from the opinion at length. The facts are different. The sixth headnote states: "In absence of a provision in Civil Aeronautics Act prohibiting exemption for any loss or damage to baggage caused by air carrier, such an exemption was not forbidden to air carrier, and Civil Aeronautics Board, being vested with authority to determine reasonableness of tariff, could properly accept such a tariff." *Frank, C. J.,* filed a vigorous dissenting opinion in which he stated that he thought the Board had no authority to accept, and legalize such a tariff.

Air Lines cites in its brief *Jones v. Northwest Airlines, Inc.* (1945), 22 Wash. 2d 863, 157 Pac. 2d 278; *Mack v. Eastern Airlines* (1949), 87 F. Supp. 113; and *Furrow & Co. v. American Air Lines* (1951), 102 F. Supp. 808. In these cases the claims arose out of delays in flight or canceled and rescheduled flights—entirely different facts. The plaintiff in her brief states "in these cases the regulations were correctly held to be binding as a matter of law as the regulations pertained directly to the operation of the airline."

The Bill of Lading Cases cited in appellant's brief are not in point, because 49 U.S.C.A., Sec. 20 (11), provides that carriers may insert in their bill of lading limitations as to the time of filing claims and instituting suit.

The Insurance Cases cited in appellant's brief are not in point. For instance, in the fire insurance cases G.S.N.C. 58-176 expressly authorizes the insertion of time limitations to file notice of claims and to commence suit.

The next question presented for our decision is, whether the plaintiff is bound by a tariff rule which is not required, or authorized to be filed by the Civil Aeronautics Act.

The evidence is uncontradicted that at the airport, after plaintiff fell and before she was carried away in an ambulance, her ticket was taken up, and Air Lines refunded to her its purchase price. Air Lines then and there had actual knowledge of her injury. The ticket she had bought was not introduced in evidence. Air Lines introduced in evidence Paragraph 8 from the ticket folder reading, "The time limits for giving notice of claims and the institution of suit are set forth in Carrier's tariffs." So far as the Record before us discloses, the Air Lines' tariffs are filed only with the Civil Aeronautics Board. Air Lines alleged in its answer, and the plaintiff admitted in her reply, that neither she, nor the American Mutual Liability Insurance Co., gave Air Lines any notice of claim for personal injuries of plaintiff within 90 days after 29 June 1950, and that neither commenced action within one year after that date.

In *Boston & M. R. Co. v. Hooker,* 233 U.S. 97, 58 L. Ed. 868, at p. 876, the Court says: "It follows, therefore, from the previous decisions in this Court, that if it be found that the limitation of liability for baggage is required to be filed in the carrier's tariffs, the plaintiff was bound by such limitation," and the Court made express reference to the notice which follows from the filed and published regulations "as required by the statute and the order of the Interstate Commerce Commission." The Court in *Pacific S. S. Co. v. Cackette,* 8 F. 2d 259 *(cert.* denied 269 U.S. 586, 70 L. Ed. 426), says that the clear purport of the Hooker decision "is that a passenger or shipper is not chargeable with notice of any regulation filed and published which is not contemplated or required by the Interstate Commerce Act or the amendments thereto." The second headnote in the *Cackette case* reads: "Provision in tariff, published under Shipping Act, Sec. 18 (Comp. St. Sec. 8146ii), requiring passenger's claims for loss or damage during voyage to be filed within 10 days, held not binding on passenger, though ticket was sold 'subject to conditions of lawfully published tariff'; the provision having no relation to rates and charges, and not being such as was required to be inserted in published tariff." In its opinion the Court said: "No provision is found in the Interstate Commerce Act which relates to rights of action against carriers for damage or injuries from negligence or assault. Notice of claims for such damages has no perceptible relation to rates and charges for transportation."

The paragraph on the ticket folder does not state what the time limit is for giving notice of claims and the institution of suit, except it refers to what is set forth in its tariffs. Plaintiff's testimony is uncontradicted that she had never read on any ticket sold to her by Air Lines the state-

CROWELL *v.* AIR LINES.

ment as to the time for giving notice and institution of suit, and did not know that the tickets contained such language.

The first headnote in The Majestic, 166 U.S. 375, 41 L. Ed. 1039, is: "A notice containing conditions, on the back of a steamship passenger's contract ticket, but not referred to therein, except by the words 'See back' printed on the face of the ticket, does not form a part of the contract binding on the passenger as to the liability of the steamship company for baggage or otherwise, where the passenger's attention is not called to the conditions, and there is no proof that he ever read or assented to them." In that case *Fuller, C. J.,* speaking for the Court says: "We quite agree with *Lord O'Hagan* in *Henderson v. Stevenson,* L.R. 2 H. L. Sc. 470, that 'when a company desires to impose special and most stringent terms upon its customers, in exoneration of its own liability, there is nothing unreasonable in requiring that those terms shall be distinctly declared, and deliberately accepted.'"

In *Southern Pacific Co. v. U. S.,* 272 U.S. 445, 71 L. Ed. 343, the Court said: "Nor were the representatives of the War Department chargeable as a matter of law with knowledge, which they did not in fact possess, of a tariff which was not required to be filed. The ordinary consequences that attend the filing of a schedule of rates with the Interstate Commerce Commission, as demanded or permitted by statute (quoting authorities), cannot be invoked by the carrier merely because it lodged a special tariff with the commission without statutory authorization."

The 11th headnote in *New York, N. H. & H. R. Co. v. Nothnagle,* 346 U.S. 128, 97 L. Ed. 1500 (decided 8 June 1953) reads: "A railroad may not exonerate itself from the consequences of its own wrongful acts by binding a passenger who has entrusted her baggage to a railroad employee to a liability limitation which the passenger has no reasonable opportunity to discover." This case was heard on Writ of *Certiorari* to the Supreme Court of Errors of Connecticut to review a judgment holding a carrier liable for loss of a passenger's baggage. The Connecticut Court, where a recovery was had in excess of liability limitation, was affirmed.

We conclude that the plaintiff is not barred by the time limitation to file claim and commence action as contended by Air Lines.

Mr. McKay in his article "Airline Tariff Provisions as a Bar to Actions for Personal Injuries," *supra,* after reviewing the Civil Aeronautics Act and numerous authorities, states: "Because Congress has not indicated an intention to occupy the field of liability of air carriers for personal injuries, it is concluded that a tariff provision, which attempts to place limitations on notice of claims for personal injuries and the time for bringing actions therefor, must yield to a conflicting state law."

G.S.N.C. 1-52, subsection 5, provides that actions for personal injuries, not arising from contract and not hereafter enumerated, must be brought

within three years. The instances hereafter enumerated in our statutes have no application to the instant case.

The trial court was correct in not nonsuiting the case on the ground that plaintiff's action was barred for failure to file claim and bring action in apt time.

Air Lines' second contention, as to the failure to nonsuit, is taking the evidence in the light most favorable to the plaintiff Air Lines was not guilty of actionable negligence, and if so, the plaintiff was guilty of contributory negligence.

A careful study of the evidence in this case shows that the plaintiff has offered sufficient evidence to require submission of her case to the jury under the law laid down in many decisions of this Court, and other courts, and further that she was not guilty of contributory negligence that bars her recovery as a matter of law. We deem it sufficient to cite cases in point: *Mangum v. R. R.,* 145 N.C. 152, 58 S.E. 913; *Leggett v. R. R.,* 168 N.C. 366, 84 S.E. 357; *Goodman v. Queen City Lines,* 208 N.C. 323, 180 S.E. 661; *Humphries v. Coach Co.,* 228 N.C. 399, 45 S.E. 2d 546; *Sears, Roebuck & Co. v. Copeland,* 110 F. 2d. 947; *Finn v. Terminal R. R. Ass'n. of St. Louis* (Mo. App. 1936), 97 S.W. 2d 890. The plaintiff was at the Airport to board as a passenger an airplane of the Air Lines; it was the duty of Air Lines to furnish her with a reasonably safe passageway from the waiting room of the Airport to its airplane she had bought a ticket to board; and this is true irrespective of any rights between the City and Air Lines under the lease of the Airport. *Horelick v. Penn. R. Co.* (1953), 13 N.J. 349, 99 A. 2d 652; *Schurman v. American Stores Co.,* 145 F. 2d 721; *Payne v. Simmons,* 201 Ky. 33, 255 S.W. 863, 33 A.L.R. 814; 10 Am. Jur., Carriers, Sec. 1288; 13 C.J.S., Carriers, Sec. 708 and Sec. 717b (1). Air Lines is not an insurer of the safety of its passengers; any liability of Air Lines must be based on negligence. *Humphries v. Coach Co., supra.*

The assignment of error for failure to nonsuit is overruled.

The appellant has fourteen assignments of error in respect to the trial court's rulings upon the evidence. In reference to these assignments of error in its brief, appellant cites as its sole authorities three general references to paragraphs in American Jurisprudence without quoting a word from that work. Without regard to whether this is a compliance with Rule 28, Rules of Practice in the Supreme Court, 221 N.C. 562, we have considered these assignments of error, and prejudicial error is not shown to exist.

The appellant has eight assignments of error as to the charge. In respect to some of these assignments of error, appellant's brief is a "pass brief," such as is condemned in *Jones v. R. R.,* 164 N.C. 392, 80 S.E. 408.

However, after a careful reading of the charge as a whole, we conclude that these assignments of error are' without substantial merit.

There was no error in the failure of the court to submit the issues tendered by Air Lines, as the issues submitted were sufficient to support a judgment disposing of the whole case. *Griffin v. Ins. Co.,* 225 N.C. 684, 36 S.E. 2d 225.

The appellant assigns as error the granting by the trial court of the motion of the City for a nonsuit as to the cross-action of the Air Lines against it.

In the lease between them it is stated that the City, called the lessor, is the owner and operator of the Charlotte Municipal Airport, and Air Lines, called the lessee, desires to hire and obtain certain premises and facilities on said Airport, together with certain rights, licenses and privileges thereon, whereupon the lease was entered into. In Art. IV of this lease the lessor agreed that it will keep in good repair the Airport and Administration Building, and the facilities and services now or hereafter connected therewith. In Art. I, Sec. C, of the lease, Air Lines was granted exclusive space of about 2,736 square feet in the Administration Building. In Art. I, Sec. B, the Air Lines was granted the right to use the Airport for the operation of its transportation system of aircraft for the carriage of persons, property and mail.

Art. XV of the lease is as follows: "INDEMNIFICATION: The Lessee, under the terms of this agreement, will not be in control or possession of said Airport (except as to the parts thereof leased exclusively to Lessee), and Lessee does not assume responsibility for the conduct or operation of the said airport or for the physical or other conditions of the same. However, it is expressly understood and agreed by and between the parties hereto that the Lessee is and shall be an independent contractor and operator, responsible to all parties for all of its acts or omissions and the Lessor shall in no way be responsible therefore. It is further agreed that in its use and enjoyment of the field, premises and facilities herein referred to, the Lessee will indemnify and save harmless the Lessor from any and all claims or losses that may proximately result to the Lessor from any negligence on the part of the Lessee, its duly authorized agents or representatives, and shall in all ways hold the Lessor harmless from same, provided the Lessor shall give to the Lessee prompt notice of any claim, damage or loss, or action in respect thereto, and an opportunity seasonably to investigate and defend against any claim or action based upon alleged negligent conduct of the Lessee or its duly authorized agents or representatives."

In support of this assignment of error Air Lines makes two contentions: First, the City contracted to indemnify Air Lines; second, regardless of

the contract, Air Lines is entitled to indemnity from the City under the equitable doctrine of primary-secondary liability.

The City and Air Lines in the lease between them have set forth in express written terms their agreement as to indemnification between themselves in Art. XV. The first sentence of this article states that Air Lines (except as to the parts thereof leased exclusively to Air Lines) does not assume responsibility for the physical or other conditions of the Airport. This sentence has no application to the duty owed by Air Lines in this case to plaintiff to furnish her, one of its passengers, a reasonably safe passage-way to its airplane she was to board. The second sentence of this article reads: "However, it is expressly understood and agreed by and between the parties hereto that the lessee (*i.e.* Air Lines) is, and shall be, an independent contractor and operator, responsible to all parties for all of its acts or omissions, and the lessor (*i.e.* the City) shall in no way be responsible therefor." The third and last sentence of this article states that it is agreed that in its use and enjoyment of the premises the lessee will indemnify and save harmless the lessor from any and all claims or losses that may proximately result to the lessor from any negligence on the part of the lessee, and shall in all ways hold the lessor harmless from same.

Nowhere in the lease is there any language that the City will indemnify Air Lines; the agreement in the lease is that under certain conditions Air Lines will indemnify the City.

From the standpoint of plaintiff the agreement of the City with Air Lines to keep in good repair the Airport and Administration Building and the facilities in connection therewith did not excuse Air Lines' neglect to provide a reasonably safe passageway for the plaintiff to its airplane. *Horelick v. Penn. R. Co.* (1953), *supra; Schurman v. American Stores Co., supra; Payne v. Simmons, supra;* 10 Am. Jur., Carriers, Sec. 1288; 13 C.J.S., Carriers, Sec. 708 and Sec. 717b (1).

The jury has found Air Lines guilty of actionable negligence. Air Lines did not except to the ruling of the court nonsuiting the plaintiff as to the City. Now Air Lines contends that under its lease with the City, the City has contracted with it to indemnify it for its own negligence. Contracts indemnifying one against his own negligence are strictly construed. *Hill v. Freight Carriers Corp.*, 235 N.C. 705, 71 S.E. 2d 133, where the cases are cited; *Southern Ry. Co. v. Coca-Cola Bottling Co.*, 145 F. 2d 304. In *Hill v. Freight Carriers Corp., supra,* Barnhill, J. (now *C.J.*), says for the Court an exculpatory clause "will never be so construed as to exempt the indemnitee from liability for his own negligence or the negligence of his employees in the absence of explicit language clearly indicating that such was the intent of the parties."

It seems clear from studying the lease that the City has not contracted to indemnify Air Lines, as contended by appellant. To hold otherwise would be to read into the lease words that are not there.

It is familiar learning that the theory upon which a case is tried in the lower court prevails in considering the appeal and the exceptions. *Walker v. Burt,* 182 N.C. 325, 109 S.E. 43; *Leggett v. College,* 234 N.C. 595, 68 S.E. 2d 263; *Parrish v. Bryant,* 237 N.C. 256, 74 S.E. 2d 726.

The appellant tendered no issue as to primary-secondary liability though he tendered two sets of issues. Nor did Air Lines tender an issue as to indemnity. Appellant requested the court to give certain instructions to the jury, but this request made no mention of primary-secondary liability or of indemnity. That would seem to preclude appellant from taking a different position in this Court.

However that may be, in Art. XV of the lease, Air Lines agreed in writing that Air Lines is, and shall be, an independent contractor or operator, responsible to all persons for all of its acts or omissions and the City shall in no way be responsible therefor. The doctrine of primary-secondary liability is based upon a contract implied by law. *Hunsucker v. Chair Co.,* 237 N.C. 559, 75 S.E. 2d 768. There can be no implied contract where there is an express contract between the parties in reference to the same subject matter. *Winstead v. Reid,* 44 N.C. 76; *Mfg. Co. v. Andrews,* 165 N.C. 285, 81 S.E. 418; *Sams v. Cochran,* 188 N.C. 731, 125 S.E. 626; *McLean v. Keith,* 236 N.C. 59, 72 S.E. 2d 44. Under the lease the doctrine of primary-secondary liability does not arise.

The evidence does not support the contention of Air Lines, that if there is any liability on the part of Air Lines, the negligence of Air Lines in relation to that of the City was passive, and that of the City active, for Air Lines was as culpable as the City, and the agreement of the City to make repairs did not exculpate Air Lines' neglect to provide plaintiff a reasonably safe passage-way to board as a passenger its airplane. Therefore, the question of primary-secondary liability does not arise, for that doctrine is based upon a contract implied in law from the fact that a passively negligent tort-feasor has discharged an obligation for which the actively negligent tort-feasor was primarily liable. *Taylor v. Construction Co.,* 195 N.C. 30, 141 S.E. 492; *Hunsucker v. Chair Co., supra.* See also *Schurman v. American Stores Co., supra.*

Appellant's assignment of error to the court's nonsuiting its cross-action against the City is overruled.

The other assignments of error have been examined, and prejudicial error is not made to appear.

No error.

BOBBITT, J., took no part in the consideration or decision of this case.