CARL C. JACKSON, ADMINISTRATOR OF THE ESTATE OF JOSEPH E. TAYLOR, Deceased v. THOMAS E. STANCIL, JR., D/B/A STANCIL FLYING SERVICE, AND JOSEPH MORENA RIVERA
AND
DEWARD SMITH v. THOMAS E. STANCIL, JR., D/B/A STANCIL FLYING SERVICE, AND JOSEPH MORENA RIVERA.

(Filed 9 November, 1960.)

**1. Aviation § 3—**

Evidence tending to show that the pilot of a plane, notwithstanding written warning that the auxiliary tank was to be used in level flight only, was using the auxiliary tank while reducing altitude and going into a bank preparatory to landing, that he failed to observe that the auxiliary tank indicator was standing on empty, that when the power failed he became excited and used the available seconds in attemping to switch tanks instead of giving attention to making a "dead stick" landing, etc., *is held* sufficient to be submitted to the jury on the question of his negligence.

**2. Same—**

While a carrier is not liable for error of judgment of the pilot which does not constitute positive negligence in exercising such judgment, the carrier is liable if the pilot, by his negligent conduct, creates a situation requiring the formation of a judgment and then errs in the exercise thereof.

**3. Same—**

The State Court has jurisdiction of an action between residents to recover for negligent injury and death in an airplane crash occurring in another state while the plane was on a trip under contract made in this State. G.S. 63-16, G.S. 63-24.

**4. Same—**

The liability of an owner or pilot of an aircraft for injury or death of a passenger must be based on negligence which is the proximate cause of the injury or death, determined by the rules applicable to negligence in general, and such carrier is not an insurer of the safety of his passengers.

**5. Same—**

The doctrine of *res ipsa loquitur* does not apply to an airplane crash,

it being common knowledge that airplanes sometimes fall without fault of the pilot.

**6. Carriers § 18—**

A private or contract carrier of passengers for hire owes them the duty to exercise ordinary care for their safe transportation; a common carrier owes them the duty of exercising the highest degree of care consistent with the practical operation of its business.

**7. Negligence § 1—**

Ordinary negligence is the failure to exercise that degree of care which an ordinarily prudent person would exercise under similar circumstances; the standard of care is unvarying, but the degree of care varies with the circumstances. The rule of utmost care imposed on common carriers, while largely a difference in degree, is also a difference in standards.

**8. Carriers § 1—**

A common carrier of passengers is one which holds itself out to the public as willing to carry at a fixed rate all persons applying for transportation within the limits of its facilities; a private or contract carrier is one which contracts separately with each individual desiring transportation.

**9. Same—**

Whether a carrier is acting as a common carrier or contract carrier is a question of fact, but where the facts are not controverted, whether the evidence is sufficient to show that the carrier is a common carrier is a question of law for the court.

**10. Same: Aviation § 3—**

The evidence in this case is held to show that defendant carrier did not hold himself out to the public, but contracted separately with all persons requesting air transportation, and therefore the evidence disclosed that defendant was a private or contract carrier, notwithstanding that he had an established place of business, operated his air service regularly as a business, and had a fixed schedule of charges.

**11. Carrier § 18: Aviation § 3—**

In an action against a pilot and his employer to recover for injury to one passenger and death of another from the negligence of the pilot, upon evidence disclosing that defendant flying service was a contract and not a common carrier, it is prejudicial error for the court to apply the standard of care required of a common rather than a contract carrier, and to charge the jury that the standard of care required of the carrier is the highest degree of care consistent with the practical operation and conduct of the business.

**12. Evidence § 51—**

A hypothetical question to an expert should be predicated upon a finding by the jury of the existence of the facts assumed in the question, and no facts should be included in the question which have not

been shown in evidence or which are not justifiably inferable from the facts in evidence.

HIGGINS, J., concurs in result.

PARKER, J., concurring in result.

BOBBITT, J., dissenting.

APPEAL by defendant Stancil from *Bone, J.,* February 1960 Term, of BEAUFORT.

The actions, consolidated for trial, grew out of an airplane crash which occurred 16 September 1957. Deward Smith and Joseph E. Taylor were passengers. Taylor was killed in the crash and Smith suffered injuries. Taylor's administrator seeks damages for wrongful death of his decedent; Smith sues to recover for his injuries. The defendants are Thomas E. Stancil, Jr., doing business as Stancil Flying Service, owner of the plane, and Joseph Morena Rivera, pilot at the time of the crash and employee of Stancil.

The complaint alleges in material part: Smith and Taylor were passengers for hire for a trip from Washington, N. C., to Teterboro, N. J., and return. Stancil is a common carrier of passengers. Defendants were negligent, in that (a) the airplane was defective and, to the knowledge of defendants, had a leak in the right wing fuel tank, (b) the plane was operated with insufficient supply of gasoline, which fact was called to the attention of and ignored by the pilot, (c) the pilot operated the plane while suffering from a severe headache which affected his efficiency in operation, (d) the pilot was not familiar with the plane he was operating; (e) the pilot was not familiar with the area over which he was flying, and (f) the pilot reduced altitude and attempted to land at the airport at Washington, N. C., after "he had switched the fuel selector valve to the auxiliary (fuel) tank, with full knowledge that the auxiliary tank would operate only in level flight and was not to be used for landings and take-offs" and, when the engines stopped for want of fuel, he became excited, lost control and crashed while attempting to "cut on the left wing tank." The crash and resulting injuries were proximately caused by these acts of negligence.

The evidence with respect to the flight and crash is briefly summarized as follows: Smith and Taylor were business partners. They arranged with Stancil for a flight to New York and return for a charge of $135.00. The trip was for business purposes. Rivera, Stancil's employee, was the pilot. He used a Bellanca plane. He made a few trial landings with the plane the afternoon before. Before taking

off it was discovered that there was a small leak in the right wing fuel tank but Stancil told them it was safe. The plane had three fuel tanks — right wing, left wing and auxiliary. At the auxiliary tank valve there is a placard that reads: "Use in level flight only." They took off at 7:10 A.M., and arrived at the Teterboro, N. J., airport, opposite New York City, at 9:30 A.M. The return trip began about 3:45 P.M. Before reaching Norfolk, Va., the right wing tank was empty and they had been flying on the left wing tank for some time. Taylor was nauseated. Smith observed that the left wing tank was less than half full, requested Rivera to land at Norfolk, refuel and permit Taylor to recover from air sickness. Smith explained they were in no hurry and would spend the night if necessary. Rivera refused to stop, said that he had plenty of fuel, was suffering from a severe headache and they would be home in 35 minutes. About 24 miles south of Norfolk the left wing tank was only one-eighth full; Rivera switched to the auxiliary tank which was then three-fourths full. He refused Smith's request that they turn back. He lost his bearings, got off his course and finally discovered they were east of Belhaven about 30 miles from Washington. They followed the River to Washington so the plane could be "ditched" if a forced landing was necessary. It was dark as they came over Washington. They fastened their safety belts. Smith testified: ". . . as we let down, letting down to get lower to the ground . . . at that time the plane was still on the auxiliary tank . . . He was letting down, he . . . put down and he began a slight right bank and as he began the bank the engine quit. . . . It was a complete cut off. It did not pop or snap, it just completely quit. At that moment we were over the airport approximately 600 feet high in the air. . . . at that point he yelled to me to turn on the panel light. . . . I turned on the panel light. He was leaning to the left to get to the gas valve. . . . I saw him take a hold to the valve and realizing you don't need any light when you are in the air and coming in for a landing, I turned it right off the split second he took hold to the valve . . . that is the last thing I did. We hit the ground at that moment. . . . When I turned the light out he had his hand on the gas valve, trying to switch the tank." Rivera appeared excited. As the pilot leaned over to switch the gasoline valve he leaned a little on the stick (wheel). The auxiliary tank showed empty. The left wing tank was then about one-eighth full. The plane crashed between the runways at the airport. Smith was rendered unconscious. Taylor died almost immediately.

The jury answered the negligence issues in favor of plaintiffs and

assessed damages. Judgment was entered accordingly. Defendant Rivera did not appeal.

Defendant Stancil appealed and assigned errors.

*Eugene Forrest Gordman, LeRoy Scott and McMullan & McMullan for plaintiffs.*

*Rodman & Rodman and Wilkinson & Ward for defendant Stancil.*

MOORE, J. Defendant Stancil assigns as error the refusal of the court to allow his motion for compulsory nonsuit. G.S. 1-183. It is our opinion that the evidence, when considered in the light most favorable to plaintiffs, is sufficient to take the case to the jury.

We refrain from a detailed discussion and analysis of the evidence. Suffice it to say that it is sufficient to justify the jury in concluding: Plaintiffs were passengers for hire. Rivera neglected to switch from the auxiliary fuel tank to the left wing tank before reducing altitude and going into a bank preparatory to landing. He knew or should have known by reason of a warning placard in plain view at the auxiliary tank that this tank was for "use in level flight only." Furthermore, he should have observed that the auxiliary tank indicator was standing on empty. When the power failed because of such neglect at an altitude of 600 feet, he became excited and used the few available seconds in attempting to switch tanks instead of giving attention to making a "dead stick" landing. This conduct on the part of the pilot was the proximate cause of the crash and resulting injuries to plaintiffs. Rivera was the agent, servant and employee of defendant appellant and at the time was about the business of his employment.

Of course a carrier would not be liable for an error of judgment of the pilot, not constituting positive negligence on his part in exercising such judgment; but liability is incurred if the pilot, by his negligent and careless conduct, has created a situation requiring the formation of a judgment and then errs in the exercise thereof. 38 Am. Jur., Negligence, s. 33, p. 579. *Conklin v. Flying Service* (1930), U.S. Av. R. 188.

While the testimony of appellant's expert witness, Henry C. Harding, was not essential in making out a *prima facie* case of actionable negligence for plaintiffs, sentences from his testimony succinctly summarize the situation here discussed: "At 600 feet I do not think a pilot would have time to switch gas tanks. If he spent the little time he did have left in getting the panel light turned on and switching the gas tank instead of looking out and getting the plane

in position to land I would say he committed error. . . . You only have one chance in making a safe landing when the motor dies out on you. A great deal depends on whether you are in the right position or not when it dies out. If you are not in the right position it is a hazardous piece of work."

As stated above we make no exhaustive discussion of the evidence. We express no opinion as to whether or not there were other acts or omissions from which the jury might legitimately infer that defendant was guilty of actionable negligence.

The court had jurisdiction of the cause of action. G.S. 63-16 and 24. The trial court correctly overruled the motion to dismiss.

Appellant excepts to the following portion of the judge's charge to the jury: "I charge you that where the relation of carrier and passenger exists, as it did in this case, the plaintiff Smith being a passenger and the deceased, Joseph E. Taylor, being a passenger and Stancil and the other defendant being carriers that the carrier owes to the passengers the highest degree of care for their safety, insofar as it is consistent with the practical operation and conduct of its business, but the liability of the carrier for injuries to a passenger is based on negligence. The carrier is not an insurer of the safety of the passengers. Now, that is the duty which the defendants owed to the plaintiffs in the case." More specifically, appellant insists that it was error to instruct the jury that defendant owed Smith and Taylor "the *highest degree of care* for their safety, insofar as it is consistent with the practical operation and conduct of its (his) business." (Emphasis ours)

G.S. 63-15 provides: "The liability of the owner of one aircraft to the owner of another aircraft, or to aeronauts or passengers on either aircraft, for damages caused by collision on land or in the air shall be determined by the rules of law applicable to torts on land." *Bruce v. Flying Service*, 231 N.C. 181, 56 S.E. 2d 560, involves an injury from an airplane crash. The Court cited and applied a number of negligence cases involving automobiles and said (p. 185): "The above citations are concerned with automobile law but agency, the *measure of negligence,* and other principles discussed are equally applicable to the law of aviation." (Emphasis added.) The weight of authority in the United States is that the liability of the owner or pilot of an aircraft carrying passengers for the injury or death of such passengers is to be determined by the rules of law applicable to torts on the lands and waters of the state arising out of similar relationships. 6 Am. Jur., Aviation, s. 45, p. 29. Anno-

tations: 12 A.L.R. 2d 656, 660-2; 69 A.L.R. 316, 328. *Wilson v. Air Transport*, (Mass. 1932) 180 N.E. 212, 83 A.L.R. 329; *Greunke v. Airways Company*, (Wis. 1930) 230 N.W. 618, 69 A.L.R. 295.

Liability of a carrier of passengers by aircraft must be based on negligence. Such carrier is not an insurer of the safety of its passengers. *Crowell v. Air Lines*, 240 N.C. 20, 31, 81 S.E. 2d 178. In a case involving an airplane crash the doctrine of *res ipsa loquitur* does not apply, "it being common knowledge that aeroplanes do fall without fault of the pilot." Furthermore, there must be a causal connection between the negligence complained of and the injury inflicted. *Smith v. Whitley*, 223 N.C. 534, 27 S.E. 2d 442.

Plaintiffs allege that defendant is a common carrier, and so acted in transporting Smith and Taylor on the trip in question. ". . . (a) distinction is made in many jurisdictions, either judicially or by statute, between common carriers and private carriers; in such jurisdictions the degree of care imposed upon a common carrier by airplane for hire is measurably greater than that imposed upon a private carrier for hire." 6 Am. Jur., Aviation, s. 52, p. 33.

In North Carolina a distinction is made between the duties owed to passengers for hire by common carriers and private or contract carriers. It has been uniformly held by us that a common carrier owes its passengers the highest degree of care for their safety so far as is consistent with the practical operation and conduct of its business. *Harris v. Greyhound Corporation*, 243 N.C. 346, 349, 90 S.E. 2d 710; *White v. Chappell*, 219 N.C. 652, 14 S.E. 2d 843; *Briggs v. Traction Co.*, 147 N.C. 389, 61 S.E. 373. A private or contract carrier of passengers for hire owes them the duty to exercise ordinary care for their safe transportation. *Pemberton v. Lewis*, 235 N.C. 188, 191, 69 S.E. 2d 512. We are committed to this distinction. Statute and decision require that we apply it in aircraft cases. We note in passing that some jurisdictions make no distinction in aircraft cases and apply the rule of highest degree of care in both situations. *Insurance Co. v. Pitts*, (Ala. 1925) 104 S. 21; 6 Am. Jur., Aviation, s. 52, p. 33.

The difference between ordinary care and the highest degree of care as these terms are applied in carrier cases is, in final analysis, largely a difference in the degree of duty, but it also involves a difference in standards.

Ordinary care is that degree of care which an ordinarily prudent person would exercise under like circumstances when charged with a like duty. Ordinary negligence is a want of due care; and due care means commensurate care, under the circumstances, tested by

the standard of reasonable prudence and foresight. "(a) prudent man increases his watchfulness as the possibility of danger mounts. So then the degree of care required of one whose breach of duty is very likely to result in serious harm is greater than where the effect of such breach is not nearly so great. . . . In short, the standard of care is a part of the law of the case for the court to explain and apply. The degree of care required, under the particular circumstances, to measure up to the standard is for the jury to decide." *Rea v. Simowitz*, 225 N.C. 575, 579, 580, 35 S.E. 2d 871. The care exercised or which should be exercised by an ordinarily prudent man is the standard of ordinary care, while the degree of care which such person exercises varies with the exigencies of the occasion. *Bemont v. Isenhour*, 249 N.C. 106, 105 S.E. 2d 431.

The "highest degree of care" imposed on common carriers is something different and more exacting. "This Court has quoted with approval Lord Mansfield's definition of the carrier's legal duty to its passengers, *viz.*: 'As far as human care and foresight could go, he must provide for their safe conveyance.' (Citing cases) . . . The definition adopted by this Court and stated repeatedly is that a carrier owes its passengers 'the highest degree of care for their safety so far as is consistent with the practical operation and conduct of its business.' (Citing authorities) . . . We perceive no inconsistency in these definitions." *Harris v. Greyhound Corporation, supra.*

In Shearman and Redfield on Negligence, Vol. 1, s. 1, pp. 6, 7, the matter is explained as follows:

"Ordinary care is such as an ordinarily prudent person would exercise under similar circumstances. That *standard* of care is unvarying, but the *degree* of care varies with the circumstances. The care required shall be commensurate with the danger.

"As a general rule, the concept of negligence as the failure to exercise 'ordinary' or 'due' or 'reasonable' care under the circumstances seemingly presents a close approach to satisfactory generality of expression. Even in jurisdictions holding to that view, however, a rule of 'utmost care so far as human skill and foresight can provide' is made applicable to railroad corporations with relation to roadbed, construction of cars, and the like.

"The rule of 'utmost care' does not merely require the degree of care usual among ordinarily prudent and competent carriers. It requires the degree of care to be expected of an unusually prudent and competent carrier. It is then something more stringent than the rule of 'ordinary' care under all the circumstances."

The question presented is whether or not, on this record, defend-

ant was on 16 September 1957 a common carrier and owed Smith and Taylor the highest degree of care for their safety, insofar as was consistent with the practical operation and conduct of his business. The evidence on this point is as follows:

Testimony of plaintiff Smith: "When I wanted to go some place by air I would call him. He was in the air transportation business. He had more than one plane out at the airport. He was operating from the Warren airport, that was his headquarters. . . . I asked him about taking us . . . to New York — Teterboro, New Jersey. That is where he said that they would land. Teterboro is just across the river from New York City. That is the airport Mr. Stancil said that he used when he made trips to New York. . . . I asked him what he would charge and he said $135.00 for both of us."

Jack Brant Armstrong testified: "I live at New Bern, N. C. I am a commercial pilot, airport operator, airport manager. . . . Yes, I know Mr. Stancil is engaged in the business of carrying passengers for hire, as a carrier for compensation. He was so engaged on September 16, 1957 in the business of a common carrier, carrying passengers for hire for compensation. . . . Yes, I know Mr. Tom Stancil who is sitting to your left. We are in the same kind of business. Both of us have aviation services, mine in New Bern and his here in Washington. He is in the air taxi or air charter business. I am not a common carrier of passengers. The airlines like Piedmont or National that run into New Bern are common carriers. Mr. Stancil and I would be charter or contract carriers. When I said in response to Mr. Gordman's question that Mr. Stancil was engaged as a common carrier I did not mean that. He is not a common, carrier."

Defendant Stancil testified: "In 1952 I operated the flying service at Asheboro, also at White Lake in a passenger riding manner and did airplane advertising with a loud speaker for the Johnson Cotton Company in North Carolina and South Carolina and continued dusting and spraying in 1952 and we are continuing that right on now and in 1953 the summer of 1953 we took the Piper dealership at White Lake for Pipers. I moved to Washington in March 1955. We moved the majority of our operation from White Lake to here, which was a small operation but most of it we moved here to Washington. I leased the airport from the Airport Commission. . . . From 1954 up until September 1957 we had airplanes for rent and airplane passenger service on a charter or air taxi or a contract — so much for the trip or so much per hour — and dusting and spraying, banner towing . . . and in late 1956 and 1957 we operated a regular daily flight to Ocracoke Island and Portsmouth Island. . . .

I hold commercial pilot and air taxi certificates. . . . I would estimate that Mr. Rivera had flown Mr. Smith more than ten times, different flights. I have flown him, I would estimate, over ten times. . . . He was a paying passenger and a prospect to buy an airplane."

Our Court in a well considered opinion delivered by *Parker, J.,* has defined "common carrier" and "private carrier." *Utilities Commission v. Towing Corp.,* 251 N.C. 105, 109, 110, 110 S.E. 2d 886. This case deals with carriers of freight, but the definitions are equally applicable to carriers of passengers. Omitting the references to carrier of goods and commodities, the language is as follows:

"A common carrier is one who holds himself out to the public as engaged in the public business of transporting persons . . . for compensation from place to place, offering his services to such of the public generally as choose to employ him and pay his charges. The distinctive characteristic of a common carrier is that he undertakes as a business to carry for all people indifferently . . .

" 'Every common carrier has the right to determine what particular line of business he will follow, and his obligation to carry is coextensive with, and limited by, his holding out or profession as to the subjects of carriage.' 9 Am. Jur., Carriers, p. 432.

"A private carrier . . . (sometimes called a contract carrier) is one who makes an individual contract in a particular instance for the carriage . . . to a certain destination. The private carrier . . . does not hold himself out to the public as ready to accept and carry . . . all who offer. . . . Each act of transportation is a separate and individual act. It is not for the public convenience and necessity, but is a private transaction. The private or contract carrier may refuse . . . to contract for carriage."

Making specific reference to aircraft carriers, it has been said: "The chief test applied to determine whether a carrier is a 'common carrier' is whether or not the operator of the aircraft either by express written or oral statements, or by his course of conduct, holds himself out to the public as willing to carry at a fixed rate all persons applying for air transportation . . . so long as his plane or planes will carry them." Rhyne: Aviation Accident Law, p. 45.

"What constitutes a common carrier, and what constitutes a contract carrier, are questions of law, but whether the carrier is acting as a common carrier or as a contract carrier is a question of fact." *Utilities Commission v. Towing Corp., supra.* Where the facts are in conflict, it is a question for the jury. *Aviation Inc. v. Moore,*

(USCA, 8C, 1959) 266 F. 2d 488. But where the facts are uncontradicted, as in this case, whether the evidence is sufficient to show that the air service is a common carrier is a question of law for the court. The carrier's descriptive label is not determinative; it is not what the carrier declares himself to be but is what the facts and circumstances show him to be. *Transport, Inc. v. Charter Company,* (D.C. 1D, Alaska 1947) 72 F. Supp. 609; *Cushing v. White,* (Wash. 1918) 172 P. 229.

For a transporter of passengers or goods by plane to be a common carrier it is not necessary that it have: A regular schedule of flights. *Transport, Inc. v. Charter Company, supra.* A fixed route. *Cushing v. White, supra.* A relatively unlimited carrying capacity. *Transport, Inc. v. Charter Co., supra.*

A carrier may limit its operations solely to charter flights and still be a common carrier. *Transport, Inc. v. Charter Co., supra.*

But the following are generally considered important factors in the operation of common carriers: An established place of business. *Smith v. O'Donnell,* (Cal. 1931) 5 P. 2d 690; 12 P. 2d 933 (1932). Engaging in the operation as a regular business and not merely as a casual or occasional undertaking. *Vincent v. United States,* (D.C. 1948) 58 A. 2d 829; *Fish v. Chapman,* (Ga.) 46 Am. Dec. 393. Regular schedule of charges. Fixel: Aviation, 3d Ed., (1948) s. 372, p. 361.

In the instant case it seems clear that defendant had an established place of business and operated his air service regularly as a business. He stated that his charges were "so much for the trip or so much per hour." From this it may be reasonably inferred that he had a fixed schedule of charges.

Appellant stated that he leased the airport from the Airport Commission. There is no explanation as to whether the Commission was a public or private body. The name of the Commission is undisclosed. The evidence does not show by what authority the Commission acted. The bare statement of appellant hardly justifies the assumption that the lease was made pursuant to G.S. 63-53, so as to impose upon defendant observance of the public rights and privileges provided for in that statute. In any event it does not now appear that the character of the lease would be controlling in this inquiry.

The fact that appellant holds commercial pilot and air taxi certificates is not decisive of the question as to whether or not he operated as a common carrier. Air taxi operators are not required to, and are not prohibited from, engaging in business as common carriers, but are temporarily exempted from certain rules and require-

ments imposed on larger operators and commercial airlines. Code of Federal Regulations, Title 14, ss. 298.3 and 298.7. The Civil Aeronautics Board recognizes that air taxi operators may under certain circumstances serve as common carriers, and it considers that "in the absence of a showing that stricter economic controls should be imposed on operators of small aircraft, such operators should be given an opportunity to develop their potential in relative freedom." Federal Register (1955) Vol. 20, No. 733, p. 4887.

The crucial test as to "whether one is a common carrier is whether he holds himself out as such, either expressly or by a course of conduct, that he will carry for hire on a uniform tariff all persons applying . . . so long as he has room." Fixel: Aviation, 3d Ed. (1948) s. 372, p. 261. "The holding out is not a formal matter, but consists of conduct naturally inducing a belief in the minds of the public." 1 J. Air L. 34 (1930). In *Vincent v. United States, supra,* at page 831, quoting from Northeastern Lines, Inc., Common Carrier Application, 11 M.C.C. 179 (1939), it is said:

"Question arises as to the meaning of the words 'holds itself out,' as applied to a common carrier. They clearly imply, we believe, that the carrier *in some way* makes known to its prospective patrons the fact that its services are available. This may be done in various ways, as by advertising, solicitation, or the establishment in a community of a known place of business where requests for service will be received. However the result may be accomplished, the essential thing is that there shall be a public offering of the service, or, in other words, *a communication of the fact that service is available to those who may wish to use it . . .*"

It is the matter of determining whether there was a "holding out" to the public that gives difficulty in this case. Appellant has an established place of business and conducted his aircraft operations as a regular business. He had three planes and carried passengers for hire. He had served plaintiff Smith many times on charter trips. His planes had made other trips to New York. For nearly a year he had "operated a regular daily flight to Ocracoke Island and Portsmouth Island." He also sold planes and was in the "dusting and spraying, (and) banner towing" business.

If appellant advertised his business in any way the record is silent with respect thereto. There is no showing that his business is listed in the Classified section of the telephone directory or similar media; the evidence discloses no newspaper, radio, television or billboard advertising. *Aviation, Inc. v. Moore, supra; Transport, Inc. v.*

*Charter Co., supra; McCusker v. Flying Service, Inc.,* 269 Ill. App. 502 (1933). Did he offer his services to the public generally or did he limit them to special clientele? What and whom did he carry on the flights to Ocracoke and Portsmouth Island? It appears that he operated three planes, but the capacity of the planes is not shown. The one used on the flight to New York was a two-seater. It could not carry in excess of three passengers, perhaps not more than two. The evidence fails to show that appellant held himself out as "in the public business of transporting persons . . . from place to place, offering his services to such of the public generally as chose to employ him," so long as he had room. Indeed, it may be that the passenger service was only occasional when planes were not in use for banner towing, dusting and spraying.

He and Smith were well acquainted. It was Smith who approached him for carriage to New York. He had been teaching Smith to fly and was trying to sell him an airplane. It is conceivable that these considerations induced appellant to undertake this particular trip.

Under the facts and circumstances of this case, it is our opinion, and we so hold, that the court erred in instructing the jury that defendants owed Smith and Taylor the duty to exercise the highest degree of care for their safety. The error is prejudicial. *Greunke v. Airways Co., supra.* There must be a new trial.

Appellant excepts to a number of hypothetical questions propounded by plaintiffs to expert witnesses and the responses. Since there must be a retrial, no good purpose would be served by *seriatim* discussion of these exceptions. But we think it well to call attention once more to general rules applicable to this class of testimony.

The cautions to be observed in framing hypothetical questions are clearly set out and discussed in Stansbury: North Carolina Evidence, s. 137, pp. 270-273. There are abundant citations of authority.

In the case at bar plaintiffs, in several instances, included in the hypothetical questions facts which were not in evidence and could not be justifiably inferred from the evidence. *Dameron v. Lumber Co.,* 161 N.C. 495, 77 S.E. 694; *State v. Holly,* 155 N.C. 485, 71 S.E. 450. Almost all the questions propounded to the expert witnesses began with the expression "assume that." This expression was followed by a recital of facts supposedly gleaned from the testimony of other witnesses. Example: "Mr. Armstrong, assume that a Bellanca . . . Cruisemaster, was in a fairly deep dive; assume that its air speed was approximately 100 miles per hour; assume that that plane continued in its dive down past the top level; assume that the control wheel or stick was suddenly pulled back . . ." (It is noted parenthetically

that several of the facts assumed in this question were not in evidence and not justifiably inferable therefrom.) "The opinion of an expert cannot be based upon an assumption of the truth of facts related to him either by a witness or any third party. The expert opinion must be based upon the assumption that the fact submitted to the expert has been established by the verdict of the jury." *Plummer v. Railway Co.*, 176 N.C. 279, 96 S.E. 1032. In *State v. Bowman*, 78 N.C. 513, quoting from *Woodbury v. Obear*, 7 Gray (Mass.) 467, it is said: ". . . (t)he proper way to interrogate the expert is, *'If certain facts assumed by the question to be established by the evidence should be found true by the jury, what would be his opinion upon the facts thus found true . . .'* " There is no hard and fast rule for framing the question and no exact combination of words is required, but it is the best practice to use an expression such as, "If the jury should find by the greater weight of the evidence that . . ." *Dempster v. Fite*, 203 N.C. 697, 167 S.E. 33. The scope and nature of the admissible testimony of expert witnesses in aircraft cases is discussed in *Bruce v. Flying Service*, 234 N.C. 79, 66 S.E. 2d 212.

Other assignments of error are not discussed. If errors there be, they will likely not recur upon a retrial.

New trial.

HIGGINS, J., concurs in result.

PARKER, J., concurring in result.

A study of the uncontradicted facts in this case leads me to the conclusion that Stancil is a common carrier, and that there is no error in that part of the charge that Stancil owed to Smith and Taylor the duty of exercising the highest degree of care for their safety, consistent with the practical operation of his business, for which a new trial is awarded.

However, in my opinion, a new trial should be allowed because of the hypothetical questions and the answers thereto mentioned in the majority opinion.

Therefore, I concur in the result.

BOBBITT, J., dissenting. If a contract carrier by air does not owe a fare-paying passenger the highest degree of care consistent with the practical operation and conduct of its business, I agree the quoted instruction was erroneous and a new trial should be awarded. Assuming the evidence sufficient to support a finding that defendant

was a common carrier, the issue of common carrier *vel non* was not submitted. The evidence did not establish defendant's status as a common carrier as a matter of law.

Even so, I perceive no sound reason for drawing a distinction between the legal duty owing by a common carrier to a fare-paying passenger and the legal duty owing by a contract carrier to such passenger. Whether the carrier is a common carrier or a contract carrier in no way affects the hazards inherent in air travel. In respect of air travel, ordinary or due care, namely, care commensurate with the known or foreseeable dangers, is no less than the highest degree of care consistent with the practical operation and conduct of the business.

G.S. 63-15 relates to collisions between aircraft, on land or in the air. In my view, it has no bearing upon whether common carriers and contract carriers owe different legal duties to fare-paying passengers.

In *Bruce v. Flying Service,* 231 N.C. 181, 56 S.E. 2d 560, plaintiff's intestate was a gratuitous passenger in a plane engaged in special maneuvers as a feature of an air show. In my view, the quoted sentence, when considered in context, has no bearing upon whether a common carrier owes a higher degree of care to a fare-paying passenger than a contract carrier owes to such passenger. Moreover, it is *obiter dicta* except as it relates to a factual situation such as then considered.

While there are many cases relating to what constitutes a common carrier, and to the legal duty of a common carrier to fare-paying passengers, Annotation: 73 A.L.R. 2d 346, decisions relating to the duty of a contract carrier to its fare-paying passengers are few and conflicting. 73 A.L.R. 2d 369-371. I share the view that no distinction, "based on whether the airplane company or operator is a common or private carrier as to the duty owed to passengers for hire," should be made.

In my opinion, the errors with reference to the hypothetical questions and answers thereto were not sufficiently prejudicial to justify the award of a new trial on that ground.

For the reasons stated, I vote to sustain the verdict and judgment.