J. Z. LORICK and Lila Mae Lorick,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Charlie W. LORICK, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Charlie E. COOK and Patricia L. Cook,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. AC–1537—AC–1539.

United States District Court
D. South Carolina,
Columbia Division.

April 19, 1967.

George Bell Timmerman, T. H. Rawl, Jr., Lexington, S. C., for plaintiffs.

Terrell L. Glenn, U. S. Atty., by Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., and J. Charles Kruse, Trial Attys., Hubert M. Crean, Dept. of Justice, Washington, D. C., for defendant.

ORDER

SIMONS, District Judge.

These three actions are brought under the Federal Tort Claims Act, Title 28 U.S.C. §§ 2671 to 2680 seeking money damages to compensate plaintiffs for property damages that occurred in Lexington County, South Carolina which were allegedly caused by the overflight of military jet aircraft on the morning of July 20, 1963. In the first action,

plaintiffs J. Z. Lorick and Lila Mae Lorick seek damages in the sum of $650.00 for damages to their fish pond. In the second action, plaintiff Charlie W. Lorick seeks to recover $2,000.00 for damages to his dwelling house. In the third action plaintiffs Charlie E. Cook and Patricia F. Cook seek $15,000.00 damages to their dwelling house. Defendant in all of these cases pleaded a general denial, or in the alternative asserted that even if government aircraft did cause the alleged damages, such claims were barred by the discretionary function exemption of Title 28 U.S.C. § 2680(a). With issues thus joined, the consolidated cases came on for trial without a jury December 5, 6, and 7, 1966. Extensive documents and photographs were offered into evidence, and in due course trial briefs were filed with the court. In compliance with Rule 52 of the Federal Rules of Civil Procedure the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The damaged properties in question, the Lorick house, the Lorick pond, and the Cook house are located in Lexington County, South Carolina, in the vicinity of the Old Market Road near S. C. Highway No. 6, which is near the Saluda Dam at Lake Murray. The Lorick and Cook houses both front on Old Market Road, and the Lorick pond is beyond and to the rear of the Cook residence.

2. On Saturday morning, July 20, 1963, at about 7:00 or 7:30 a. m., three military jet aircraft flew over plaintiffs' properties approximately two to three hundred feet above the ground. The flight approached the properties along a northwestward course passing first over the Lorick residence, then over the Cook residence, and then over the Lorick fish pond dam.

3. During the period in question the United States Armed Forces were conducting military exercises known as "Swiftstrike" in the vicinity of Lexington County. Troops had been in the area immediately prior to the incident in question although none of the witnesses saw any troops on the day in question.

4. Plaintiff Charlie W. Lorick, a supply service man for Southern Bell Telephone and Telegraph Company, was at home between 7:00 and 7:30 a. m. planting shrubbery in his yard, when he heard aircraft approaching. He looked up, saw three airplanes with sweptback wings, observed that numbers were printed on the aircraft and that "U.S. A.F." and stars were printed on their wings. Plaintiff testified that just as the planes were directly over the Cook house he heard what sounded like an explosion, the sound of which "carried longer than one or two sticks of dynamite."

5. Plaintiff Charlie E. Cook, a carpenter for eight years, and his wife were getting out of bed about 7:00 to 7:30 a. m. when they heard a loud explosion and felt the house shake. Mrs. Cook testified that the loud noise sounded like dynamite exploding. Mr. Cook who had heard a sonic boom before surmised that this noise was the same thing. Both ran to the window to look out but could see and hear nothing more. They did not hear the sound of aircraft at the moment of the blast. On this information Mrs. Cook called the Swiftstrike Headquarters to report these events.

6. Mrs. Norma Corley, a neighbor, lived a few hundred yards from the Cook and Lorick homes. A field separated her home from the residence of Mr. and Mrs. Cook. She was in this field picking butterbeans for her pastor. She heard a terrifying noise with which she was completely unfamiliar. She had been looking down preoccupied with her task, and her reaction or curiosity to look up was delayed for some moments. When she did look up, which she testified might have been in "two or three minutes", she saw three airplanes flying toward the lake and she "knew what had happened". She could not identify the planes, nor could she say how high they were flying, but she was positive that there were three aircraft. Upon cross-examination she testified that she did not hear two or three sounds, but that

she heard only one that sounded like "dynamite".

7. Plaintiff James Z. Lorick lived in the vicinity of the pond-dam in question. He is the father-in-law of Charles E. Cook and the father of Charlie W. Lorick. He was not at home when the aircraft flew over. His wife, Mrs. Lila Mae Lorick, was home at the time. She testified that she was standing in her kitchen at the sink when she heard "a loud noise".

8. None of the witnesses testified that they observed any of the alleged damages occur during the overflight of the aircraft. However, the property owners did testify that they had not noticed any damages to their property prior to this occasion, but that the alleged damages were found immediately after the overflights in question.

9. Plaintiff Charlie W. Lorick owns a six-room brick veneer residence which is the subject matter of his claim. It has a living room, den, two bedrooms, kitchen, sewing room, a bathroom and a powder or half bathroom. The Loricks first occupied their residence in March of 1963 although the house was not formally completed until around the 1st of April. They testified that they had a one-year warranty on their house from their contractor, and for this reason they maintained a careful lookout for defects. Mr. Lorick testified that immediately after the aircraft flew over on July 20, 1963 he noticed for the first time small hairline cracks in some of the bricks and mortar on the outside of his home; that the ceiling dropped in the kitchen and the sewing room; that the roof developed a leak causing water damage to the ceiling of the living room; that the tile cracked in the bedroom and half bath; and that a door between the bedroom and the half-bath became stuck. Testimony on behalf of defendant ascribed some of this damage to the cracking of the concrete foundation of a supporting pillar under the house, and a shifting of the position of the pillar. When the aircraft flew over, most of the windows in the Lorick house were open, although none of the panes in the windows were broken. The only closed window was located on the front of the house, the side away from the direction the aircraft approached.

10. Mr. and Mrs. Cook's home was a six-room residence of concrete block exterior wall construction, containing a living room, den, kitchen, three bedrooms, two baths, a foyer, and a middle hall connecting all of the rooms. There was also a small porch serving as an entry into the house from the front. Mr. Cook who had done personally most of the inside carpentry work on his home was intimately familiar with it. He testified that there were no noticeable defects before these events, but afterwards he found the following: There were numerous hairline cracks in the concrete block and in the mortar joints; much of the outside paint had flaked off and dropped to the ground; numerous cracks appeared in the joints of the interior sheetrock; a leak developed in the roof resulting in water damage to the ceilings; nails in the sheetrock had pulled loose; tile had cracked in both bedrooms, and the front window frames were warped to the extent that the windows would not close. Plaintiffs' expert witness Wingard, an architectural constructural products supplier who was also a graduate civil engineer, testified that the house was not structurally sound and that the hairline cracks in the block and mortar could not be satisfactorily repaired and was not safe for continued occupancy. On the other hand defendant's expert witness Carswell, a structural engineer and architect, experienced in the construction and maintenance of concrete block type buildings, testified that the hairline cracks did not cause any structural weakness of the walls; that in his opinion they were settlement cracks, or were caused by lack of enough moisture in the mortar at time the blocks were laid. He said the house was structurally safe and the cracks could be easily repaired. He was of the opinion that the walls were structurally sound and that the building was safe for continued use as a dwelling. The windows in the

Cook house were of the awning type known as "Miami awning windows" which open and close with a crank type mechanism.

11. Construction of the pond-dam in question was completed on January 20, 1962 by plaintiff J. Z. Lorick, nineteen months before the events of July 20, 1963. It was a dirt dam 10 feet in height, and 100–125 feet in length. Mr. and Mrs. Lorick had visited the dam on the Friday afternoon before and had found it in good condition at that time. On Saturday afternoon July 20, 1963, numerous cracks had appeared in the dam both on the roadway on top and on its side. A few days later water started seeping through the cracks, and the dam had to be repaired at a cost of $550.00.

12. Defendant offered the expert testimony of Dr. John Henry Wiggins, Jr. Dr. Wiggins was the Director of the White Sands Sonic Boom testing project of the Federal Aviation Agency which represented the first large scale test program by the Government, dealing with the "sonic boom" phenomena, their causes and effects, their intensity and the damages that resulted therefrom to many different types of structures from aircraft flying overhead at supersonic speeds. Dr. Wiggins also directed the tests for the sonic boom program at Oklahoma City, Oklahoma. Since the testimony of the eye witnesses placed this overflight of three aircraft at a height from 200 to 300 feet, Dr. Wiggins was questioned hypothetically as to whether such an overflight could cause damage to structures on the ground. Dr. Wiggins' uncontradicted expert testimony was that such aircraft flying at less than supersonic speeds could only produce noise and that such noise could only affect structures by causing "rattling", but it could not cause damage. He testified that although a human is very sensitive to vibration caused by the noise of an aircraft, a structure is not. Nevertheless, he testified that aircraft traveling at supersonic speeds can cause damage. As the aircraft approaches supersonic speed the noise begins to travel at the same speed as that at which the noise is generated. When the aircraft goes beyond the speed of sound at approximately 765 miles per hour there is a "pile-up" of these sound waves and they spread in all directions from the aircraft, and if these sound waves are strong enough to reach the ground one will hear a "boom" which is actually two distinct sounds heard in rapid succession. The boom continuously follows the aircraft as long as it flies at the supersonic speed, and after the speed of sound is passed the waves come off from the front of the aircraft in a conical direction. A second wave is created at the tail of the aircraft which accounts for the two sounds heard on the ground. If it could be seen, an observer in the aircraft would actually see a parabolic or cone shaped wave along the path of the aircraft. The sonic boom is in reality a shock wave which is created by the build-up of the sound waves. The strength of, or the pressure created by, a sonic boom which reaches the ground will vary in intensity depending upon the height of the aircraft, its size, weight and speed, the atmospheric temperature, wind direction and velocity, the moisture content of the air, and the general terrain.

The pressure exerted by the sonic boom shock wave is called "over-pressure" and is measured in pounds per square foot of area. The over-pressure referred to is not a pressure that is exerted on a structure in the same manner in which a wind would push upon it, but the structure is being subjected to a "squeezing" effect, the pressure being suddenly increased from all directions, front, back, side and top.

If the three aircraft in question were flying at supersonic speeds, Dr. Wiggins' testimony would indicate that the low altitude and the high pressure that would occur directly beneath the passing aircraft could cause damage on the ground. If the three aircraft were flying side by side the intensity would be cumulative. If the aircraft were flying behind one another the effect would be diminished. Dr. Wiggins indicated,

however, that it was very improbable that three aircraft in formation were flying supersonic speeds since the wave phenomenon from one aircraft would adversely affect the others.

13. I find as a fact that, although three Government military aircraft passed over the property in question between 7:00 and 7:30 a. m. on July 20, 1963, these aircraft were not flying at supersonic speeds. The testimony and the irrefutable logic indicate that if aircraft flying at 200 to 300 feet above the ground were visible so that one could identify markings on the aircraft at the time they were heard, they could not have been traveling at the speed of sound. Dr. Wiggins testified that an aircraft immediately above an observer then creating a sonic boom would travel two miles in the next one-tenth of a second. Aside from the improbability of three aircraft in formation flying at supersonic speeds, it would have been impossible for plaintiff Charles Lorick and Mrs. Norma Corley upon merely hearing the boom to be able to look up and see the aircraft.

14. The lowest threshold of damage to a building from a sonic boom is the shattering or breaking of glass windows, and the causing of bric-a-brac, such as pictures, vases, and other decorative items on shelves or tables to fall. Since the sonic boom creates a shock wave that exerts a squeezing effect on a building it is highly improbable that such pressure would produce cracks in concrete blocks, brick and mortar which would not at the same time shatter or at least crack some of the glass windows in the Cook and Lorick homes even if the windows were open. It is also unlikely that the cracking in the exterior walls of the Lorick and Cook homes was caused by sonic booms since such pressure from a sonic boom would compress rather than cause tension. The cracks in the Lorick and Cook homes as testified to were most probably caused by natural expansion and contraction, foundation settlement, or improper moisture content of the mortar at the time the masonry was laid.

15. Just as significant as the lack of any glass breakage or damage to bric-a-brac was the fact that plaintiff's alleged damages continued to progress from July 20, 1963 to the present. The uncontroverted expert testimony established that when a sonic boom does cause damage that damage occurs immediately and does not progress from that time forward. In reference to the Lorick house plaintiffs alleged that the "sonic boom" caused the door from the master bedroom to the bathroom off the master bedroom to stick or jam. Nevertheless, they also testified that this condition was corrected several times by cutting off parts of the door, but that the condition reoccurred at subsequent times. Another clear example of the inconsistency of the type of damage claimed with that found to result from sonic booms is the condition in the bedroom in the Cook house. Plaintiff Charlie Cook testified that there were cracks in the sheetrock or sheetrock joints and "nail pops" which resulted from the overflights in question. He further testified that the cracks were completely repaired by patching plaster and that the nails were driven back in before the bedroom was repainted. He then further stated that the same "nail pops" and cracks have now reoccurred.

16. Also of significance was the location of the damage. The undisputed expert testimony was that sonic boom damage occurs mainly on the leading side of the building and that the damage one finds on the trailing side should be significantly less. Contrasted with this scientifically documented fact is the damage claimed in these cases. The testimony of plaintiff Charlie Cook was that the cracking in the exterior of his home followed no pattern but was a random cracking existing in approximately the same amount or degree on all sides and areas of the exterior of the house.

17. The only logical explanation as to what caused plaintiffs' damages which is amply supported by expert testimony is that such damages came about as a result of natural causes. Hairline cracks,

as existed in the Cook house, are not unusual in cement block structures because of the tendency of the dry cement block to pull the moisture from the mortar at the time the block is laid. There was an increased likelihood of this in the Cook home since no reinforcing was used in the foundation nor was joint reinforcing used in the cement block walls. Additionally the expert testimony indicated that many of the floor joists in this house were of an inadequate size to support the load thus causing a deflection of the floor from the traffic upon it. In regard to the Lorick house, the expert testimony indicated that the cracks in the exterior brick for the most part did not result from any external force, but were intentional markings manufactured in the bricks so as to simulate old or used brick. Other cracks resulted from pressure exerted from the fill dirt behind porch walls causing brick displacement. Other cracks were thought to have been caused by the freezing of foundations, or from the use of unreinforced foundations. The buckling of the door leading from the master bedroom to the bathroom was caused by the settlement of a pier beneath the house. Consistent with the settlement was the fact that the area underneath the house occasionally had water standing in it. Mr. Lorick stated that it had been necessary for him to make a hole in the wall to allow the water to escape rather than to allow it to stand in the area.

In regard to the Lorick pond dam, defendant's expert Mr. Gross, a geologist employed by the United States Soil Conservation Service with twelve years experience, responded to a hypothetical question setting forth and based upon the facts of the claim; he testified that in his opinion the cracks in the Lorick dam were *most probably* caused by dry weather which resulted in shrinking of the soils in the dam. It is the uncontradicted testimony of this witness that the Lorick dam had been improperly constructed. The soil in the Lexington area, he testified, was not suitable for dam construction. Special construction is required; that is, the proper placement of plastic and lean silt in the dam can lead to successful construction. He indicated that the critical factor in dam construction was the moisture content of the compressed soil, which had not been considered in the original construction of the Lorick dam. It is also illogical that this alleged sonic boom could have cracked an earth dam, but did not cause any glass damage in houses in the nearby area.

CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and the subject matter of this action.

2. South Carolina has adopted the Uniform Aeronautics Act found in Section 2–1 et seq. of the 1962 South Carolina Code of Laws. Section 2–6 of the Code establishes absolute liability for damages to persons or property caused by the overflight of aircraft. This section provides:

"§ 2–6. *Liability for damages.*—The owner of every aircraft which is operated over the land or waters of this State is absolutely liable for injuries to persons or property on the land or water beneath caused by ascent, descent or flight of the aircraft or the dropping or falling of any object therefrom, whether such owner was negligent or not, unless the injury is caused in whole or in part by the negligence of the person injured or of the owner or bailee of the property injured. * * *"

Under this section the infliction of injuries or damages by the operation of an airplane in itself is a wrongful act giving rise to liability, and the United States is liable under the Federal Tort Claims Act when such damages are inflicted by airplanes operated by Government employees on business for the United States. United States v. Praylou, 4 Cir., 208 F.2d 291 (1953), cert. den'd. 347 U.S. 934, 74 S.Ct. 628, 98 L.Ed. 1085 (1954); Long v. United States, 241 F. Supp. 286, (W.D.S.C.1965) (Wyche, J.).

■ Nevertheless, defendant contends that it is incumbent upon plaintiffs to prove negligence in the operation of the aircraft in order to maintain their actions under the Tort Claims Act. It relies upon Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), and United States v. Hull, 195 F.2d 64 (1st Cir. 1952), among other cases;[1] and it urges this court not to follow *Praylou*. However, I find the argument unpersuasive since in *Praylou* not only did Judge Parker fully consider and distinguish *Dalehite* and *Hull*, but he very succinctly stated the rationale of the rule:

> "It is generally impossible to establish with any certainty the cause of the falling of an airplane. To apply the res ipsa loquitur rule, as we did in the D'Anna case, supra, is, as stated, not very different from applying the rule of absolute liability; and for the law of a state to prescribe the latter instead of the former does not seem to us to remove the case from the liability which the government undertook to assume under the Tort Claims Act. On the contrary, it seems to us that it would be absolutely absurd to hold that the government is liable under the Tort Claims Act for the act of an employee who crashes into a house with a truck but not liable if he crashes into it with an airplane, and this on the theory that there is absolute liability under state law in the latter case but not in the former. The man on the street would never understand any such distinction; and in the minds of thoughtful lawyers it would do little credit to the law." 208 F.2d 291 at 295.

Although South Carolina has no res ipsa loquitur rule, Hunter v. Dixie Home Stores, 232 S.C. 139, 101 S.E.2d 262 (1957), McLain v. Carolina Power & Light Co., 286 F.2d 816 (4th Cir. 1961),

Perry v. Carolina Theater, 180 S.C. 130, 185 S.E. 184 (1936), it is not necessary for plaintiffs here to prove negligence in defendant's operation of its aircraft on the occasion in question in view of Section 2-6, supra, as such section has been interpreted by the Fourth Circuit in *Praylou* as applying to suits under the Tort Claims Act.

Nevertheless, it is essential to their causes of action that plaintiffs prove a causal connection between the overflight of defendant's aircraft over their property and their alleged damages.

■ 3. Plaintiffs here have proved an overflight by government military aircraft, and they have also proved that their properties have suffered some damages. However, they have not proved by a preponderance of the evidence that such aircraft produced sonic booms, or that there was any causal connection between the overflights of such aircraft and the alleged damages to their properties. To recover they must establish by the preponderance of the evidence that the overflight of the government aircraft over their properties was the proximate cause of their damages. Although plaintiffs introduced no direct evidence or testimony to the effect that the overflights had any causal connection with the damages alleged, nevertheless their testimony that none of the damages existed prior to the overflight and that such damages were found immediately thereafter could support an inference of causal relationship between the overflight and the alleged damages. However, in accordance with the foregoing factual findings that the aircraft were not flying at a supersonic speed, the conclusion is evident that there was no causal connection between the overflight and the damages since the undisputed expert testimony is that the aircraft in question traveling at less than supersonic speeds could not have caused

---

1. The government also cites Dabney v. United States, 249 F.Supp. 599 (W.D.N.C. 1965), as such a holding in the Fourth Circuit. It must be pointed out, however, that the North Carolina substantive law does not impose strict liability in this situation, nor does the state allow the res ipsa loquitur rule to be used. Jackson v. Stancil, 253 N.C. 291, 116 S.E.2d 817 (1960).

the damages in question. Furthermore, even if the aircraft were in fact traveling at supersonic speeds and creating sonic booms, when the type, location and nature of the damages are considered the conclusion is still inescapable that such damages as did occur were not caused by a sonic boom. Such damages are inconsistent with the type, nature and location of damages scientifically found to occur from the sonic boom phenomena. See Dabney v. United States, 249 F.Supp. 599 (W.D.N.C. 1965).

The preponderance of the evidence before the court is that the overflight of the three government aircraft was not the proximate cause of the damages and that plaintiffs are not entitled to recover in these cases. Regardless of the conclusions herein reached, the court has no doubt about the sincerity of plaintiffs and their able counsel in their firm beliefs that plaintiffs' damages resulted from the sonic boom.

The Clerk will enter judgment for the defendant in each of the three cases.

And it is so ordered.